FRUEHAUF TRAILER CO. v. GILMORE
et al.

No. 3569.

Circuit Court of Appeals, Tenth Circuit.

March 12, 1948.

---

Clayton B. Pierce, of Oklahoma City, Okl., for appellant.

Coleman Hayes, of Oklahoma City, Okl., for appellees.

Before PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

Since prior to November 11, 1942, L. A. Gilmore, S. H. Gardner, and L. P. Kirk have been partners, doing business as Gilmore, Gardner & Kirk Oil Company.[1] Fruehauf Trailer Company[2] is a Michigan corporation authorized to do business in Oklahoma. The Central Surety & Insur-ance Corporation[3] is a Missouri corporation authorized to do business in Oklahoma.

By this action the partners and the Insurance Company sought recovery of amounts paid out by them by way of indemnity or restitution, predicated on alternative grounds, namely, negligence in failure to inspect a tank trailer sold by Fruehauf to the partners and breach of an implied warranty of fitness of the tank trailer.

Sometime prior to November 11, 1942, the partners order from Fruehauf a tank trailer equipped with a metal tank containing three separate compartments. A working agreement existed between Fruehauf and Independent Metal Products Company[4] under which Fruehauf took the entire output of metal tanks manufactured by the Products Company. Shortly before November 11, 1942, 60 tanks had been manufactured by the Products Company and delivered to Fruehauf in Omaha, Nebraska. None of these tanks met the specifications of the tank ordered by the partners. Hence, the tank was modified by replacing 2-inch lines with 3-inch lines from the compartments to a manifold, the installation of such manifold and of an additional basket tire carrier. The tank was mounted on a semi-trailer and the tank and trailer were delivered to the partners in Omaha by Fruehauf about November 11, 1942.

The tank was inspected by a Fruehauf inspector after it had been constructed by the Products Company, but no interior inspection was made after the larger lines and the manifold had been installed.

The partners used the tank for the transportation and delivery of gasoline. On December 10, 1942, Emmons, an employee of the partners, filled the three compartments of the tank with gasoline at the Phillips Petroleum Refinery at Okmulgee, Oklahoma, and transported such gasoline to the garage of the Oklahoma Transportation Company,[5] at Oklahoma City, Oklahoma.

---

[1] Hereinafter referred to as the partners.

[2] Hereinafter referred to as Fruehauf.

[3] Hereinafter referred to as the Insurance Company.

[4] Hereinafter referred to as the Products Company.

[5] Hereinafter referred to as the Transportation Company.

The capacity of the front compartment was 1695 gallons, of the middle compartment 505 gallons, and of the rear compartment 1852 gallons. The manifold was located in front of the right rear wheel of the trailer. Each compartment was connected to the manifold by a 3-inch line and adjacent to the manifold and in each of such lines there was a shut-off valve. Connected to the manifold there was a discharge pipe to which the discharge hose was connected when gasoline was being delivered. A master valve was located in such discharge pipe. The valves are illustrated by the following photograph:

Emmons testified that before filling the tank trailer at Okmulgee, he checked the valves and turned each of them down as far as it would turn.

When Emmons arrived at the garage of the Transportation Company, an employee of that company instructed Emmons to deliver 1852 gallons into the Transportation Company's storage tank. That tank was located underground beneath the floor of the garage. The receiving pipe leading to the Transportation Company's tank was located outside the building. Emmons attached the delivery hose and connected it with the receiving pipe and opened the valve in the line from the rear compartment and opened the master valve. He remained outside the building next to the tank trailer until he heard somebody shout inside the building and he then looked through the window and observed gasoline coming out of a pipe leading from the floor to the storage tank underneath. He then shut the master valve and went inside the building to help clean up the gasoline. The gasoline became ignited and he then went out and drove the tank trailer away from the scene of the fire and notified Mr. Kirk. Kirk came to the garage and remained there until the fire was extinguished. He and Emmons then went to the tank trailer, where they made a preliminary inspection of the three compartments. The valve to the rear compartment was wide open. Kirk tested the valves in the lines leading from the middle and front compartments and they appeared to be fully seated. There were about 100 gallons of gasoline in the rear compartment and the level of the gasoline in the front compartment was about one foot below its level when fully filled. They moved the tank trailer to 2100 Exchange Avenue, Oklahoma City, where they discharged the remainder of the gasoline from the three compartments. Kirk estimated that approximately 200 gallons had been discharged from the front compartment. An inspection of the valve in the line leading from the front compartment was made and a piece of welding rod about $\frac{3}{16}$ths of an inch in diameter was discovered in the channel of the valve which had prevented the valve disk from fully seating. The three compartments, when fully filled, held 4052 gallons. Assuming that the three compartments were fully filled, and contained 4052 gallons, when Emmons began his delivery of gasoline to the Transportation Company, and deducting therefrom the amount of gasoline which remained in the three compartments, it was estimated that 2097 gallons of gasoline were discharged into the Transportation Company's tank, or 245 gallons more than the capacity of the rear compartment.

The distance from the floor of the compartments to the level of the gasoline, when the compartments were full, was approximately 4½ feet.

The fire caused severe burns to Walker, an employee of the Transportation Company, substantial damage to the garage and the equipment therein, and to vehicles and motor busses stored in the garage.

There was in force a policy of insurance issued to the partners by the Insurance Company insuring the partners against liability for bodily injury and property damage caused by an accident arising out of the ownership, maintenance, or use of the tank trailer.

On September 1, 1943, a suit was commenced by Walker against the partners to recover damages. A settlement agreement was reached and a consent judgment for $3,000 was entered in favor of Walker and against the partners. The Insurance Company paid the judgment and it was satisfied on June 20, 1944.

On February 3, 1944, a suit was commenced against the partners in the superior court of Seminole County, Oklahoma, by the Transportation Company and others to recover damages in the total sum of $30,794.31. On the same day, the Texas & Oklahoma Stages and the Merchants Fire Insurance Company instituted another action in the superior court of Seminole County, Oklahoma, against the partners to recover $1,014.41 on account of damages to a bus located in the Transportation Company's garage at the time of the fire. The Insurance Company employed counsel to defend the partners in such actions in Seminole County and, since the claims exceeded the insurance coverage, the partners also employed counsel to whom they paid $1,500 as attorney's fees. Both suits in the superior court of Seminole County resulted in verdicts in favor of the partners.

The partners notified Fruehauf, on October 1, 1943, of the fire and the possibility of claims being asserted for personal injuries and property damage and demanded that Fruehauf defend such actions and save the partners harmless. Fruehauf denied responsibility and refused to defend the actions.

On February 13, 1946, the partners and the Insurance Company instituted this action against Fruehauf. Their claim was predicated on two theories: (1) That Fruehauf was negligent in failing to properly inspect the tank trailer before delivering same and in permitting the piece of welding rod to remain in the front compartment; and (2) that Fruehauf knew at the time of the delivery of the tank trailer that it was intended to be used to transport gasoline, a highly dangerous, inflammable, and explosive substance, and permitted the piece of welding rod to remain in the front compartment of the tank and thereby breached its warranty of fitness of the instrumentality; and that such piece of welding rod lodged in the valve in the front compartment and prevented the valve from fully closing, thereby causing a portion of the gasoline to be discharged from the front compartment and resulting in the overflow of gasoline from the Transportation Company's storage tank and the ensuing fire, injury, and damage. The partners sought to recover the $1,500 expended by them as attorney's fees and the Insurance Company sought to recover the $3,000 paid by it in satisfaction of the Walker judgment.

Fruehauf set up as defenses that the legal foundation and basis of the actions brought against the partners was the negligent acts of Emmons and that the partners and the Insurance Company were estopped from maintaining the instant action. It also set up that each claim was barred by the Oklahoma two-year statute of limitation.

The trial court submitted special interrogatories to the jury, to which the jury answered: (1) That the piece of welding rod was in the compartment of the tank trailer at the time of its delivery to the partners; (2) that Fruehauf was not negligent; and (3) that the partners were negligent and that such negligence contributed to the overflow of the storage tank and the resulting fire and damage.

The partners and the Insurance Company filed a motion for judgment on the

ground that there was no substantial evidence from which the jury could find negligence on the part of Emmons and that the undisputed proof established an implied warranty of fitness and a breach thereof by Fruehauf. The court concluded that the third finding was not supported by the evidence and awarded judgment in favor of the partners and the Insurance Company. Fruehauf has appealed.

Since the valve in the front compartment was partially open and valve in the rear compartment was fully open, and the head of gasoline in the front compartment was several feet higher than the head of gasoline, if any remained, in the rear compartment, gasoline was discharged from the front compartment into the rear compartment from the time Emmons closed the master valve until the compartments were drained. While the specific time that elapsed between the time the master valve was closed by Emmons and the time Kirk made a preliminary inspection at the place to which Emmons had moved the tank trailer was not shown, the proof shows that it was a substantial period and it is a reasonable conclusion that the 100 gallons of gasoline in the rear compartment had flowed from the front compartment into the rear compartment after the master valve was closed by Emmons, and that the contents of the rear compartment had been fully emptied into the Transportation Company's storage tank.

The evidence introduced by the partners established that Emmons exercised ordinary and reasonable care under the attendant circumstances and was free from negligence. To meet that evidence and establish its defense that the partners were guilty of negligence, which was the proximate cause of the storage tank overflowing and the ensuing fire and damage, Fruehauf offered evidence that the ratio of the area of the opening from the valve in the line from the front compartment, with the valve disk turned down to where it engaged the piece of welding rod, to the area of the opening from the valve in the line from the rear compartment when that valve was fully open, was 1 to 31, and from that fact asked the jury to infer that 245 gallons could not have discharged from the front compartment while 1852 gallons were discharged from the rear compartment, and from that fact infer that Emmons must not have closed the valve in the front compartment down to the piece of welding rod. It offered no evidence as to the effect of increase in the relative velocity of discharge in favor of the front compartment as the head of the liquid in the rear compartment fell substantially below the head of the liquid in the front compartment as the two compartments discharged, and it offered no evidence as to the period of time that the two compartments continued to discharge into the storage tank.

Obviously, Fruehauf could not contend that Emmons left the valve to the front compartment fully open, because had that been so, the discharge from the two compartments would have been approximately the same.

As we shall undertake to show, the head of the valve was an important factor. Therefore, it may be well to define the term. "Head" at a given point in the fluid in a container is defined as the vertical distance from that given point to the open surface of the fluid. The given point in the fluid here is the valve of the respective compartments.

Well-recognized hydraulic laws demonstrate that if the valve from the front compartment had been closed down to the piece of welding rod and the valve from the rear compartment was wholly open, while the rate of discharge from the two compartments at the outset would be relatively in proportion to the size of the two openings, since the levels of the liquid were approximately the same distance above the valves in each compartment at the commencement of discharge, that such ratio of discharge would not remain constant. This, because the height of the head in the rear compartment would fall much more rapidly than the height of the head in the front compartment as the two discharged. According to Torricelli's (1608-1647) theorum, recognized as sound since first discovered and propounded, the discharge from an orifice under a head, "h," has a theoretical velocity equal

to the velocity acquired by a body falling freely in vacuo to a vertical distance h, that is

$$V = \sqrt{2gh}$$
$$\text{or } h = \frac{V^2}{2g}$$

The expression is $\frac{V^2}{2g}$ is termed the velocity head.

V = theoretical velocity jet in feet per second

g = acceleration due to gravity, taken as 32.16.

More simply stated, it is "that the velocity of efflux of a liquid from an orifice is equal to that of a body falling freely through a distance equal to the head of the liquid" (See Webster's New International Dictionary, 2d Ed.); and velocity is proportional to the square root of the head.

It follows that as the two compartments discharged through the master valve into the storage tank, the velocity of efflux from each compartment decreased as the head therein decreased. However, since the head in the rear compartment dropped from four and one-half feet to zero while the head in the front compartment was dropping from four and one-half feet to about three and one-half feet, the rapidity and extent of the decrease in velocity of efflux from the former was substantially more than from the latter.

While the velocity of efflux and the amount of discharge from the two compartments at the beginning was in proportion to the size of the respective openings therefrom, since the heads were then equal, as the head in the rear compartment continued to fall below the head of the front compartment, the ratio of the amount of discharge from the former to the amount of discharge from the latter continued to decrease and, since the head in the former fell four and one-half feet while the head in the latter was falling one foot, the appreciation in the relative amount of discharge in favor of the front compartment was substantial.

Thus, it will be seen that the relation between head and velocity and the effects of the relative decreases of the heads in the two compartments on the relative velocities of discharge therefrom, were factors necessary to be considered in determining the ratio of discharge between the two compartments.

Furthermore, there is no testimony as to how long a time elapsed between the time Emmons opened the master valve and the time he closed such valve. For aught that is disclosed by the evidence, the rear compartment may have drained entirely and the front compartment may have continued to discharge after the rear compartment was empty. That possibility is not foreclosed by the fact that on inspection, 100 gallons of gasoline were found in the rear compartment, because, as we have shown, that gasoline might have flowed from the front compartment into the rear compartment between the time the master valve was closed and the tank trailer was inspected by Kirk.

Absent any expert testimony respecting the relation between head and velocity and the combined effect of the greater decrease in the head in the rear compartment and the lesser decrease in the head in the front compartment on the ratio of discharge between the two compartments, and, absent any evidence as to whether the front compartment continued to discharge after the rear compartment had emptied, a conclusion by the jury that 245 gallons of gasoline could not have discharged from the front compartment while the master valve was open, if the valve of such compartment was turned down to the piece of welding rod, was nothing more than guess or conjecture. It is well settled that a jury's verdict cannot rest upon mere guess or conjecture.[6]

[6] Franklin v. Skelly Oil Co., 10 Cir., 141 F.2d 568, 571; Goodall Co. v. Sartin, 6 Cir., 141 F.2d 427, 434; Shapleigh v. United Farms Co., 5 Cir., 100 F.2d 287, 289; Baltimore v. Louisville & N. R. Co., 4 Cir., 146 F.2d 358, 360; Southern Ry. Co. v. Stewart, 8 Cir., 119 F.2d 85, 89; Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 334, 53 S.Ct. 391, 77 L.Ed. 819; Mackey v. Jarvis, 180 Okl. 404, 69 P.2d 662, 664; Ingram v. Dunning, 60 Okl. 233, 159 P. 927, 930; Midland Valley R. Co. v. Rupe, 87 Okl. 286, 210 P. 1038, 1039; Bloom v. Bailey, 292 Pa. 348, 141 A. 150, 152, 57 A.L.R. 585.

330

■ The two actions brought in the superior court of Seminole County constituted no basis for a finding of negligence because they resulted in verdicts in favor of the partners. The judgment in the action brought by Walker was a consent judgment entered to carry out a compromise agreement. It was not based upon any findings of fact or any determination on the merits. It was not a judicial determination by the court of any litigated right.[7] In entering it, the court merely exercised an administrative function in recording what had been agreed to between the parties.[8] It, therefore, afforded no basis for a finding of negligence.

We conclude that the court, therefore, properly set aside the answer of the jury to the third interrogatory.

■ Since the action was for indemnity or restitution, the partners' cause of action did not arise until they discharged the claim for attorney's fees, and the cause of action of the Insurance Company did not arise until it paid the Walker judgment.[9]

Fruehauf contends that the third paragraph of § 95, 12 Okl.St.Ann., applies and that the limitation period was two years. The partners and the Insurance Company assert that the second paragraph of § 95, supra, applies and that the period of limitation was three years. Since the action was brought within two years after the Insurance Company paid the judgment and the partners paid the claim for attorney's fees, it was not barred under either of such paragraphs of § 95, supra.

■ The Uniform Sales Act was adopted in Nebraska in 1921. Here, the partners, by implication at least, made known to Fruehauf the particular purpose for which the tank trailer was acquired and was to be used. Therefore, under Revised Statutes of Nebraska, 1943, Vol. 4, Ch. 69, § 415(1), there was an implied warranty that the tank trailer was reasonably fit for such purpose.[10] The failure to remove the piece of welding rod from the front compartment was a breach of that implied warranty for which the Insurance Company and the partners were entitled to recover over against Fruehauf.

Affirmed.

---

[7] New York Cent. & H. R. R. Co. v. Stuart & Son Co., 260 Mass. 242, 157 N. E. 540, 543; Texas & Pacific Ry. Co. v. Southern Pacific Co., 137 U.S. 48, 56, 11 S.Ct. 10, 34 L.Ed. 614; Lawrence Mfg. Co. v. Janesville Cotton Mills, 138 U.S. 552, 562, 11 S.Ct. 402, 34 L.Ed. 1005; Cutter v. Arlington Casket Co., 255 Mass. 52, 151 N.E. 167, 170; Granzow v. Village of Lyons, Ill., 7 Cir., 89 F.2d 83, 86.

[8] Wadhams v. Gay, 73 Ill. 415, 435.

[9] Ashley Borough v. Lehigh & Wilkes-Barre Coal Co., 232 Pa. 425, 81 A. 442, 444; City of Springfield v. Clement, 205 Mo.App. 114. 225 S.W. 120, 124; Appa-

lachian Corporation, Inc., v. Brooklyn Cooperage Co., Inc., 151 La. 41, 91 So. 539, 543; Imperial Refining Co. v. Kanotex Refining Co., 8 Cir., 29 F.2d 193, 201; McEvoy v. City of Waterbury, 92 Conn. 664, 104 A. 164, 165; Johnson v. Davis, 146 Okl. 170, 293 P. 197, 199.

[10] See, also, Crane Co. v. Sears, 168 Okl. 603, 35 P.2d 916, 921; Dayton Power & Light Co. v. Westinghouse Electric & Manufacturing Co., 6 Cir., 287 F. 439, 442, 37 A.L.R. 849; London Guarantee & Accident Co. v. Strait Scale Co., 322 Mo. 502, 15 S.W.2d 766, 768, 64 A.L.R. 936; Mowbray v. Merryweather, 2 Q.B. 640—C.A.; Note, 64 A.L.R. 942.