## JERRY ROSSMAN CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.

### No. 105, Docket 21098.

United States Court of Appeals Second Circuit.

Argued June 7, 1949.

Decided July 5, 1949.

Charles Korn, New York City (Marvin S. Machson, New York City, on the brief), for petitioner.

I. Henry Kutz, Washington, D. C., Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, Lee A. Jackson, Sp. Assts. to the Atty. Gen., for respondent.

Randolph E. Paul, Washington, D. C., filed a brief, as amicus, on behalf of Pacific Mills.

Before L. HAND, Chief Judge, and CLARK and FRANK, Circuit Judges.

L. HAND, Chief Judge.

The petitioner appeals from an order of the Tax Court, in banc, seven judges dissenting, assessing a deficiency in its excess profits tax for the year 1943. Only one question is involved: whether the taxpayer was entitled to deduct a payment made to the United States during the year in question in circumstances to be stated. The taxpayer was a "converter" of "greige goods," which shrink or stretch in the process of dyeing to an extent not determinable in advance. During the period in question its prices were fixed upon a "cost plus" basis by regulations pomulgated under the Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix, § 901 et seq., of which the opposite one provided that a "converter" might fix a "working allowance shrinkage" in his contracts with his customers, but that this must be limited to a maximum, which for the purpose of this appeal it is not necessary to describe. In May, 1943, the taxpayer learned that, because it had accepted and charged the shrinkage figures given it by the "finishers" to whom it had sent the goods to be dyed, it had unwittingly overcharged its customers by claiming larger shrinkages than the regulation allowed. Although the Office of Price Administration had not started any investigation of the taxpayer's charges and had not until then undertaken to investigate them, its president asked the advice of the Office as to what he should do. The official to whom he went suggested that he return the

overcharges to the customers; but this was altogether impracticable. In the first place, it involved going over more than 200 accounts; and, more important, the taxpayer's customers were not entitled to the overcharges anyway, for they had passed them on to the consumers. For these reasons the official consented that the taxpayer should settle the whole matter by paying the gross overcharge to the United States in one sum and this it did on May 17, 1943. That payment is the disputed deduction. Nobody suggests that the overcharge was deliberate; but the Tax Court did find that it was "not too clear from the evidence that the overcharges in question might not have been avoided, if the petitioner had adopted other more appropriate measures."

▮▮▮ Three questions arise: (1) whether the payment can be regarded as a "penalty" at all; (2) supposing it can be so regarded, whether no "penalties" are deductible as "ordinary and necessary expenses" of a business under § 23(a) (1) (A);[1] and (3) if some penalties are, and some are not, deductible, whether this "penalty" is among those which may be deducted. First, it seems apparent to us that the payment of the overcharge—which is all that is here involved—can on no theory be treated as the payment of a "penalty." Taken in its broadest sense that word has a punitive, as opposed to a remedial, meaning; it covers fines and other exactions which are not restitution for a wrong, and are only justified, either as a deterrent, or in order to satisfy an atavistic craving for retaliation.[2] A seller's duty to return the overcharge to the "terminal buyer": that is, to one "who buys * * * for use, or consumption other than in the course of trade or business," is so clearly not a "penalty" under this definition that no agument can make it plainer than its bare statement. The only possible excuse for confusion is that § 205(e)[3] gave to the "ter-

minal buyer" a claim, not only to recover the overcharge, but twice its amount in addition; and we will assume that the addition was a "penalty" (though even that is not absolutely certain).[4] However, a recovery of three times the overcharge is no less a recovery of the overcharge because it includes the penalty along with it. Hence, if the taxpayer had been able to distribute the overcharge to the "terminal buyers," and had done so, the distribution would have been deductible. It did not make such a distribution because it could not; but in its stead it paid the overcharge to the Administrator upon his agreeing not to press for more. We agree with the Commissioner that this was not a voluntary payment, or a gratuity; § 205(e) imposed upon the taxpayer a duty to the Administrator in precisely the same terms as its duty to the "terminal buyer"; and, although that duty was conditional upon the "terminal buyer's" being "not entitled to bring suit," we will assume that in the case at bar that condition was fulfilled. However, the Administrators claim, like the "terminal buyer's" claim for which it is a substitute, is also made up of the overcharge and an addition of twice its amount; and the Commissioner must maintain that the part of it, which is made up of the overcharge, is a "penalty" and loses its character as restitution even though the Administrator demands only the overcharges. There is no basis for such a conclusion. The taxpayer wished to abandon the overcharge; it recognized that the fund belonged to the "terminal buyers"; and, since the "terminal buyers" were inaccessible, the overcharge "was subject * * * to the right of appropriation by the sovereign as bona vacantia,"[5] even though, strictly speaking, it may not have been "the subject of escheat."[6] Indeed, if § 205(e) had not intervened, conceivably as matter of strict theory, the overcharge might have passed to the several states.

---

[1] Title 26 U.S.C.A.

[2] United States v. Chouteau, 102 U.S. 603, 611, 26 L.Ed. 246; Lipke v. Lederer, 259 U.S. 557, 562, 42 S.Ct. 549, 66 L.Ed. 1061; United States v. La Franca, 282 U.S. 568, 572–574, 51 S.Ct. 278, 75 L.Ed. 551.

[3] 56 Stat. 34, 50 U.S.C.A.Appendix, § 925(e).

[4] § 216(b), Title 29 U.S.C.A.

[5] Anderson National Bank v. Luckett, 321 U.S. 233, 240, 64 S.Ct. 599, 603, 88 L.Ed. 692, 151 A.L.R. 824.

[6] United States v. Klein, 303 U.S. 276, 58 S.Ct. 536, 82 L.Ed. 840.

Assuming, however, that we are wrong, and that the payment can be regarded as that of a penalty, the second question is whether in no circumstances could it be an "ordinary and necessary expense" of the business. The Revenue Act does not declare that penalties may not be deducted; the doctrine is a judicial gloss—and, for that matter, a gloss of the lower courts only, save as the Supreme Court recognized it by implication in Commissioner v. Heininger.[7] We agree that it is a proper gloss (indeed we have ourselves enforced it several times);[8] and its justification is that, when acts are condemned by law and their commission is made punishable by fines or forfeitures, to allow these to be deducted from the wrongdoer's gross income, reduces, and so in part defeats, the prescribed punishment. Obviously, to relieve the wrongdoer of a part of the tax due upon his income, in effect is to remit that much of the sanction imposed; as would at once be apparent, if we were to compare the case of a wrongdoer who has an income with that of one who has none. Hence, if one rigorously applied the doctrine, a taxpayer could never deduct the payment of fines and forfeitures; and we can see no relevant distinction between them and legal expenses incurred in an unsuccessful effort to prevent their collection. Indeed, to hold otherwise would be to subsidize the obduracy of those offenders who were unwilling to pay without a contest and who therefore added impenitence to their offence; and for this reason in the decisions just cited we held that such legal expenses were never deductible. The Supreme Court overruled this doctrine in Commissioner v. Heininger, supra;[9] and the question is as to the scope of that decision. It is possible to read it as distinguishing between the legal expenses of an unsuccessful defence and the payment of fines or forfeitures. On the other hand, it is also possible to read it as meaning that, whether the claimed deduction be of legal expenses or of fines or forfeitures, its allowance depends upon the place of sanctions in the scheme of enforcement of the underlying act. We think that the second is the right reading; in short that there are "penalties" and "penalties," and that some are deductible and some are not. This we infer, not only because the result of denying deductibility only to legal expenses would, as we have said, put a premium upon resistance, but because of the following language, which was the kernal of the ratio decidendi: "If the respondent's litigation expenses are to be denied deduction, it must be because the allowance of the deduction would frustrate the sharply defined policies * * * which authorize the Postmaster General to issue fraud orders." 320 U.S. at page 474, 64 S.Ct. at page 254, 88 L.Ed. 171. Again: "We hold therefore that the Board of Tax Appeals was not required to regard the administrative finding of guilt * * * as a rigid criterion of the deductibility of the respondent's litigation expenses." 320 U.S. at p. 475, 64 S.Ct. at page 254, 88 L.Ed. 171. Perhaps the deduction of a fine or forfeiture after an "administrative finding of guilt," is more likely to "frustrate" the "sharply defined policies" of a statute which imposes it, than the deduction of the legal expenses of an unsuccessful defence—though that seems questionable—but certainly there is no more ground for taking as "a rigid criterion" the imposition of the fine than the incurrence of the expenses. Each may "frustrate the sharply defined policies" of a statute; that will depend upon how one views their deterrent effect. We hold therefore that in every case the question must be decided ad hoc.

■ This conclusion leads directly to the third question: whether, even though the overcharge was a "penalty," its allowance as a deduction would "frustrate" any "sharply defined policies" of the Emergency Price Control Act of 1942. It is impossible to find an answer in general terms; indeed any answer goes to the very root of one's theory of criminal law. Happily, in the case at bar, we are not left to speculation,

---

[7] 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171.

[8] Burroughs Building Material Co. v. Com'r, 2 Cir., 47 F.2d 178; Gould Paper Co. v. Com'r, 2 Cir., 72 F.2d 698; National Outdoor Advertising Bureau v. Helvering, 2 Cir., 89 F.2d 878.

[9] 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171.

for we have an answer from the best possible source—the Administrator himself. The body of regulations, by which the United States sought. to control prices during the last war, was extraordinarily complicated and difficult to comprehend. That was inevitable; the innumerable varieties of commercial transactions to be covered made possible nothing simpler. One may indeed argue, as the Commissioner does, that the more unsparing and relentless was the pursuit of offenders, however innocent they may have been of any wilful violation of the regulations, the more solicitous would they become to comply, and the more effective would be the enforcement of the Act. That has been a school of penology since the time of Draco; but it has not been the only school, and, as we read Commissioner v. Heininger, supra,[10] the Supreme Court did not accept it. The Administrator did not believe that such a rigid and uncomprising policy was the best way to realize the purposes of the Act. When the amendment to § 205(e) was being considered in 1944, he declared in a letter to the Senate Committee "that the protection of innocent violators from excessive damages" was "obviously desirable"; and that it had been his "policy to adjust cases involving innocent violations by payment of merely the amount of the overcharge." He thought that Congress had given him discretion not to sue for "treble damages" in some instances, and he had exercised that discretion so as "to avoid undue hardship in deserving cases." In short, he did not believe that it paid to sweep into the same pool with wilful or careless violators, violators for whom the daedalian mazes of the regulations had proved too much. Moreover Congress showed in 1944 by the amendment of § 205 (e) that it agreed with the Administrator. It seems to us that we should accept these expressions as evidence that in cases where the Administrator accepted the overcharge as sufficient, it did not "frustrate" any "sharply defined" policies of the Emergency Price Control Act of 1942.

Hence, we hold erroneous the order assessing the deficiency. First, we say that on no theory was the payment of the overcharge to the United States the payment of a "penalty." Second, we say that, even if it was the payment of a "penalty," that is not a "rigid criterion" of its deductibility. Third, we say that there was positive and compelling evidence that to allow such a deduction would not "frustrate" the policies of the underlying act. It is true that although the order were reversed, it would not inevitably follow that the deficiency should be expunged. The practice of the Administrator was to accept the overcharge as adequate compliance only if the seller had both acted in good faith, and had taken all "practicable precautions"; and the Tax Court found, as we said at the outset, that it was not "too clear" that in this case the taxpayer "might not have avoided" the overcharges by "more appropriate accounting." So it may be argued that the taxpayer did not carry the burden of proof of showing that the deduction would not "frustrate" the Act. It is true that this would be irrelevant to the first point; for, if the payment was only restitutionary, it could not be a penalty in any event. On the other hand, lack of proper care would be relevant to the third point: whether the allowance would "frustrate" the Act. However the Administrator's consent to accept the overcharge showed that he thought that the taxpayer had in fact used adequate care; and that was enough. We do not say that his decision was final; but it stands uncontradicted, and it was the judgment of one who was in the best possible position to make an estimate.

The deficiency determination also included adjustments not here in controversy. The order of the Tax Court is reversed; the deficiency is expunged so far as it results from disallowance of the deduction of the payment to the United States, and the cause is remanded to the Tax Court for recomputation of the taxes involved in conformity with the opinion of this court.

---

[10] 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171.