**A. D. JUILLIARD & CO., Inc.,**
**Plaintiff-Appellant,**

v.

**James W. JOHNSON, Collector of Internal Revenue for the Third District of New York, Defendant-Appellee.**

**No. 335, Docket 24931.**

United States Court of Appeals
Second Circuit.

Argued June 11, 1958.

Decided Sept. 29, 1958.

Stroock & Stroock & Lavan, New York City, and Steptoe & Johnson, Washington, D. C. (Stephen Ailes and William C. Hill, Washington, D. C., and Martin D. Eile, New York City, of counsel), for appellant.

Paul W. Williams, U. S. Atty., Southern Dist. of New York, New York City (John S. Clark, Myra Schubin, New York City, Asst. U. S. Attys., of counsel), for appellee.

Before HINCKS and WATERMAN, Circuit Judges, and RYAN, District Judge.

RYAN, District Judge.

Juilliard & Co., appellant taxpayer, filed suit in the District Court seeking a refund of excess profits taxes assessed and paid by it for the calendar year 1943 (Sec. 3772, Title 26 U.S.C. and Sec. 1340, Title 28 U.S.C.). Judge Leibell after trial without a jury gave judgment dismissing the complaint upon the merits.

Judge Leibell, as has been his custom, filed carefully prepared full and complete findings of fact and conclusions of law; he also filed a separate opinion. He has by his industry and scholarly thoroughness lightened the burden of this court; familiarity with his decision is assumed.

The suit raised the right of the appellant to deduct in its 1943 excess profits return two items, $410,219.31 and $4,184.63 as ordinary and necessary business expenses (Sec. 23(a) (1) (A), I.R.C. 1939, 26 U.S.C. § 23(a) (1) (A)). Both sums represent the amounts paid to the Administrator of the Office of Price Administration by the appellant in compromise and settlement of civil treble damages alleged to have been incurred for overpricing on sales made by Juilliard in violation of Maximum Price Regulation 163, promulgated under Emergency Price Control Act of 1942 (56 Stat. 23, 50 U.S.C.A.Appendix, § 901 et seq.). The Commissioner of Internal Revenue refused to allow these payments or any part of them as ordinary and necessary business expense deductions. Judge Leibell denied any refund of taxes paid after computation based on such disallowance. We hold the result reached by the judge to be correct and affirm.

The OPA issued General Maximum Price Regulation, effective April 26, 1942, freezing all prices in the economy at the March, 1942 level. Thereafter, on June 16, 1942, the OPA issued effective June 22, 1942 MPR 163 which established ceiling prices on woolen and worsted civilian apparel fabrics for manufacturers.

Juilliard & Co. had long been a large manufacturer of women's woolen and worsted apparel fabrics. It also sold rayon, silk and cotton fabrics but fifty percent of its total sales of $52,091,804. in 1942 was of woolen and worsted goods. Its mercantile operations were subject to the provisions of the Act and the regulations promulgated.

MPR 163 set up and defined three classifications of fabrics—"continuous" fabrics, embracing fabrics previously manufactured; "comparable" fabrics being fabrics of the same weave and containing substantially the same number of ends and picks per finished inch, the same yarn sizes, the same weight per yard, width and finish, and belonging to the same classification as a fabric sold by the manufacturer during the applicable base period, but manufactured from different blends of raw material; and "new" fabrics consisting of those which could not be classified as "comparable" or "continuous."

Juilliard on July 17, 1942 filed with the OPA its first ceiling price reports as required by MPR 163, for the period from June 22 to September 8, 1942. The reports covered thirty-eight fabrics all priced as "comparable" fabrics. The Juilliard method of pricing was difficult to understand as the raw material content was not indicated and of this the OPA advised it by letter of September 12, 1942. Official report forms had not been devised and most of the reports received by the OPA were unsatisfactory to it. The OPA concluded that this situation was due to the fact that the MPR 163 test for "comparable" fabrics afforded the manufacturer too wide a latitude. Amendment 4 of MPR 163 was published on September 2, 1942 (effective September 8, 1942) and this specified maximum tolerances by which a "subject" fabric could vary from a "base period" fabric in elements of construction. The amendment also set up a fourth classification—"similar" fabrics to include those fabrics which were similar in use, serviceability and appearance to a base fabric and yet could not fit within the category of "comparable" fabrics. Amendment 4 of MPR 163 continued in effect the provisions for relief where ceiling prices were not fair or equitable, but Juilliard at no time petitioned for a price adjustment on the basis of hardship. The trial judge has found that Juilliard relied on its own interpretation of the regulation and amendment and sought to avoid using the pricing formula for a "new" fabric.

About September 20, 1942, the OPA had complaints from consumers about Juilliard's prices particularly on fabric style number A2391 which was the Juilliard lead fabric. It had been reported by appellant as "comparable" to the base period fabric W4512. By letter dated October 8, 1942 the OPA advised Juilliard that no refiling of the report of July 17, 1942 having been made on the standard forms supplied by the OPA after the September 8, 1942 Amendment 4, it had on analysis of the Juilliard reports as filed found that thirty-two of the thirty-eight fabrics reported on July 17, for the first period (June 22 to September 8, 1942) were not "comparable" and directed Juilliard to make refunds to its customers of excess charges. On October 19, 1942 Juilliard submitted reports on forty-seven fabrics under Amendment 4; thirty-five used "similar" and twelve "comparable" fabrics in computing the ceiling price. The trial judge found that of the thirty-five "similar" fabrics reported, twenty-nine exceeded the permissible tolerances and of the twelve "comparable" fabrics four exceeded the permissible tolerances. At a conference in Washington on October 22, 1942, the OPA advised Juilliard that no variations from the tolerances would be permitted and that the reports filed would have to be corrected and refiled. Following this, the OPA by letter dated November 6, 1942 notified Juilliard fabric by fabric that the ceiling prices of thirty-three fabrics (filed October 19, 1942) did not conform to the Regulation and that Juilliard would have to file new reports for both periods (under original MPR 163 and under Amendment 4), to which Juilliard replied by letter dated November 12, 1942 that the matter would be attended to by a Juilliard official on November 23, 1942 upon his return from a business trip. The OPA determined to institute a civil enforcement suit for injunctive relief and statutory damages.

A complaint was filed on November 19, 1942 in the United States District Court for the Southern District of New York. It alleged three separate counts: Counts I and III prayed for injunctive relief, Count II sought to recover a money judgment under Section 205(e) of the Act for the violations alleged. The trial judge has found that under a strictly literal application of the Regulation Juilliard would have been liable for $391,-249.29 in overcharges on the fabrics listed on a schedule annexed to the complaint. When trebled the overcharges would have amounted to $1,173,747.87.

With the filing of the complaint the OPA obtained from the District Court an order citing appellant to show cause why an injunction *pendente lite* should not issue and it temporarily restrained appellant from selling twenty-seven specified styles of woolen and worsted goods, until new reports on ceiling prices had been submitted to the OPA and approved. It also prevented Juilliard from receiving payment from its customers for merchandise previously delivered until new ceiling prices could be determined. This resulted in holding up collection of over $300,000. of Juilliard's outstanding accounts; Juilliard later was permitted to receive and deposit in a separate fund the amounts due from customers to whom it had made sales of these specified fabrics. The suit was settled and compromised by stipulation of January 29, 1943 under which appellant paid to the Treasurer of the United States $410,219.31—three times the overcharges as calculated in compromise by the parties at the time of the settlement. It is important to note that this stipulation of settlement provided *in haec verba* "defendant agrees to pay to the Treasurer of the United States the sum of $410,219.31 in full settlement and compromise of any and all claims of the plaintiff arising out of the facts specified in Count II of the complaint." As part of the settlement a consent judgment was entered on February 1, 1943 granting only injunctive relief against appellant; the stipulated amount of treble damages having been previously paid no money

judgment was entered—although this payment was mentioned and referred to in the preamble of the judgment.

The payment of $410,219.31 under the settlement is one of the two payments which Juilliard sought to deduct on its 1943 excess profits tax returns as an ordinary and necessary business expense.

At trial Julliard contended that it was so harassed, and its business so jeopardized by administratively inspired publicity and news releases that it was forced to settle and pay damages under duress. The trial court has held that in calculating the overcharges the OPA was considerate and that Juilliard had violated the Regulation in fixing the ceiling prices on most of its woolen and worsted fabrics for women's wear, especially on its best sellers and that whatever "duress" resulted from the OPA suit had its origin in appellant's violation of MPR 163 and was a direct consequence of the application of the legal sanctions provided by Section 205(a) and (e) of the Emergency Price Control Act. He also concluded that appellant's many violations in 1942 of the regulation were the result of negligence and its failure to take practicable precautions against the occurrence of the violations, and that the payment made by appellant of $410,-219.31 in settlement was its free and voluntary act, after negotiations in which it had been represented by able counsel. There is ample in the record to sustain the trial judge's findings supporting these conclusions.

The discussions were initiated by Juilliard counsel; the settlement was reached after negotiations which extended over two months. At that time the OPA had no policy of settling treble damage suits for less than three times the amount of overcharges. It was prior to the passage of the Chandler amendment of June 30, 1944 (58 Stat. 632–640), and the courts had no alternative but to impose treble damages; lack of wilfulness or inadvertence was no defense to a violation of the regulations. Bowles v. American Stores, 78 U.S.App.

D.C. 238, 139 F.2d 377, certiorari denied 322 U.S. 730, 64 S.Ct. 947, 88 L.Ed. 1565; Bowles v. Indianapolis Glove Co., 9 Cir., 150 F.2d 597.

The violations alleged were segregated into two periods—June 22, 1942 (the effective date of MPR 163) to September 8, 1942 (when Amendment 4 became effective), and from September 8, 1942 to November 21, 1942. Calculated upon a literal reading of the Regulation single damages for the first period amounted to $121,171.70 and for the second period to $270,077.59. As part of the settlement the OPA waived entirely any claim for damages for the first period.

The problem of the markup for allowable margin over and above manufacturings costs was also the subject of compromise. With the Juilliard operations the allowable markup presented more than the usual problems. It manufactured woolen and worsted fabrics in two mills—at Providence and at Stottville. Because of a strike at the Providence mill in 1941 the profit of that plant for that year had been practically nil; the Stottville plant had shown about 20%. The regulations provided for the taking of a company-wide markup on "new" fabrics and this resulted in an applicable markup for Juilliard "new" fabrics of 9.8%. Juilliard urged that under this markup of 9.8% it would not operate profitably. The damages which the OPA sought had been reached by computing the overcharges as the difference between the prices charged by Juilliard and the ceiling price calculated on a "new" fabric basis in accordance with regulations. The settlement figure was arrived at by allowing Juilliard to use the Stottville markup in calculating the ceiling price on a "new" fabric basis, and this reduced the overcharges for the second period in suit from $270,077.59 to $136,739.77. This concession however was not extended by the OPA so as to make the Stottville markup applicable to the fixing of any of the 1943 allowable ceiling prices for "new" fabrics. The stipulation made as part of the set-

tlement fixing the 1943 allowable ceiling prices for the violation fabrics applied the company-wide markup and not the Stottville 20% markup. Thus, for purposes of settlement of the OPA civil action only, the parties calculated the violation overcharges only in the following amounts—

| Fabric | Single | Treble |
|--------|--------|--------|
| A2391 | $110,098.30 | $330,294.90 |
| W4648 | 7,258.20 | 21,774.60 |
| W4649 | 17,450.58 | 52,351.74 |
| Other | 1,932.69 | 5,798.07 |
| | $136,739.77 | $410,219.31 |

After the payment of $410,219.31 in settlement Juilliard by checking and audit discovered that it had collected on other sales ceiling price overcharges in the amount of $30,009.24 for the period of August 1, 1942 to October 28, 1943, and made undercharges of $27,630.50 for the period from April 1, 1943 to October 28, 1943. Juilliard made a voluntary disclosure of this to the OPA by letter of October 28, 1943. In settlement the OPA credited appellant with the reported overcharges made prior to August 1, 1942 (for which no damages were recoverable under Sec. 205(e)) and permitted it to deduct the amount of undercharges. The OPA agreed to and did accept on February 2, 1944 an offer of settlement set forth in a letter from Juilliard of January 21, 1944 forwarding its certified check for $4,184.63 "in full payment of net maximum price overcharges for the period from June 22, 1942 to January 21, 1944."

The payment of $4,184.63 thus made is the second item which appellant sought to deduct on its 1943 return as an ordinary and necessary business expense. The trial judge has found that the overcharges involved in the net figure of $4,184.63 were at least the result of Juilliard's failure to take practicable precautions to comply with MPR 163.

After the settlement and compromise of the civil suit, appellant found fabric A2313, a prior fabric, to be "similar" to fabric A2391 (which in the settlement discussions had been regarded as a "new" fabric). It applied to the OPA for approval to set up A2313 as a base fabric for calculation of the ceiling price of A2391. The OPA gave its consent and Juilliard was thereafter permitted to figure a new ceiling price for fabric A2391 which it will be recalled was a Juilliard lead fabric. We have heretofore noted that as part of the settlement of the suit, a stipulation (the third) was made under date of January 29, 1943; to this stipulation was annexed as Exhibit 1 a schedule of agreed maximum prices for a list of Juilliard fabrics. Included in this schedule was fabric A2391 with a maximum ceiling price of $2.825 per yard. It appears that priced as a fabric "similar" to A2313 the allowable ceiling price for A2391 would be $2.975, with an increased ceiling price differential of $.15 a yard. At trial and now on appeal Juilliard urges that it should be in any event tax credited with this difference as an overpayment on the settlement of $.15 per yard of A2391 sold amounting to a total of $44,074.54 which trebled would be $132,223.62. It contends that of the $410,219.31 paid in settlement, the sum of $132,223.62 was paid under a mistake of fact and on transactions for which it was not liable in damages in any amount, since as to these there had been no violation.

We find in the trial judge's decision and opinion specific factual findings more than sufficient to support his conclusion that "Juilliard's mistakes were

so many and so basically wrong, that they were due, at least, to Juilliard's negligence and to its failure to take proper precautions to avoid violating the provisions of MPR 163." The conclusions reached were not premised on an erroneous holding, as appellant maintains, that an OPA treble damage payment is *ipso facto* not deductible. It was noted by the trial judge that,

"The consent judgment and settlement of the OPA action is not considered by this court as showing that the Juilliard Company either wilfully caused the overcharges to be made, or that they were the result of negligence or of Juilliard's failure to take 'practicable precautions' to avoid violating MPR 163."

The trial judge was not forgetful of Jerry Rossman Corp. v. Commissioner, 2 Cir., 175 F.2d 711 or of George Schaefer & Sons v. Commissioner, 2 Cir., 209 F.2d 440. The burden of establishing that the violations (which were clearly proved) were not the result of failure to take proper precautions was properly placed on plaintiff-appellant. American Brewery v. United States, 4 Cir., 223 F. 2d 43. This burden the record shows it failed to carry.

This appeal in final analysis presents for us two questions: (1) does the trial record contain evidence to support the findings that the Juilliard violations were the result of a failure to take practical precautions and (2) should a re-examination of the amounts paid by Juilliard after compromise as damages for such violations if found now be made to determine whether payment, in whole or in part, was made when not legally due or under a mistake of fact.

That Juilliard committed many violations is beyond question; there is sufficient evidence to convince us that these were more than inadvertent. The findings that appellant failed to take practicable precautions are supported by the evidence.

After Juilliard discovered that fabric A2391 could properly be classified for

ceiling price calculation as "similar" to fabric A2313 in its 1941 line, it neither judicially nor administratively made application to reopen the settlement it had made to attempt to recoup the $132,223.-62 it now claims was solely attributable to excess payments as treble damages on fabric A2391. To have done so would have subjected all the violations alleged to re-examination and the possible insistence by the OPA (or at least the opportunity to insist) upon payment of damages for the waived violations of the first period or the application of the company-wide markup instead of the more liberal Stottville markup in the computation of damages.

The short and complete answer to the argument of appellant with respect to this $132,223.62 lies in the fact that no part of the total sum of $410,219.31 paid in settlement of the civil suit can be said to have been paid for any specific violation. It was a payment made and received by the OPA in compromise of all the violations alleged. The stipulation of settlement recorded it was paid "in full settlement and compromise of any and all claims of the plaintiff arising out of the facts specified in Count II of the complaint." The fact that as part of the mechanics of the settlement administrative justification was found in adopting a formula for computing the total reached and paid did not change the result accomplished and intended— a lump sum payment in compromise of all the violations charged. That this was an arbitrary formula and not intended or understood by the parties to earmark and limit each figure shown as an overcharge to a specific fabric listed alongside is evident from the fact that the total addition of $410,219.31 settled violations for both periods (Count II all claims) and that only the second period is included in the calculations; that the total arrived at includes the reduction accomplished by the permitted Stottville markup although this is not revealed by the figures, and that an amount of $1,-932.69 trebled to $5,798.07, is shown as

an overcharge attributable to fabrics identified only as "other."

We do not agree with the learned trial judge that the settlement became an integral part of the judgment entered and therefore conclusive and immune from collateral attack in this suit. The judgment granted only equitable and injunctive relief as prayed for in Counts I and III; it did not constitute an adjudication on the claims for damages asserted in Count II, for these had been already disposed of by the parties by separate stipulation and compromise on which no judgment was ever entered. Yet, we do hold that the appellant is precluded from now urging that the full amount of $410,219.31 was not actually paid for admitted violations of the Act, because it voluntarily settled on the basis of that sum.

It is conceded by Juilliard that insofar as it might seek to recover the sum of $132,223.62 from the OPA "that book is closed." It is nonetheless closed in our opinion, when it seeks to recover indirectly part of that sum by way of a tax exemption, when in order to do so it must reopen for consideration the question of its liability to the Administrator at the time of the compromise. And, this would follow even if appellant paid this money for a supposed violation which if litigated would have been found non-existent and on which appellant would have been exonerated. A party by settlement may surrender rights that the law would have sustained, but that is no reason for disregarding the settlement. Hennessy v. Bacon, 137 U.S. 78, 79, 11 S.Ct. 17, 34 L.Ed. 605; Staten Island Hygeia Ice & Cold v. United States, 2 Cir., 85 F.2d 68. The settlement was entered into by appellant to make the best terms possible with the OPA; the "hope of gaining was balanced against the risk of losing. There was an exchange of equivalents, irrevocable except for fraud, a settlement of a controversy presumably honest." Yonkers Fur Dressing Co. v. Royal Ins. Co., 247 N.Y. 435, 160 N.E. 778, 782; Castell v. United States, 2 Cir., 98 F.2d 88. Appellant as a result enjoyed the benefit of a waiver of liability for violations committed in the first period and a reduction in the overcharges for the second period as a result of the application of the 20% markup. It would be unfair for it, after retaining these benefits to attempt to repudiate such part of the settlement as fifteen years later it discovers was less favorable to it than was warranted by the facts or the law. Backus v. United States, 59 F.2d 242, 75 Ct.Cl. 69, certiorari denied 288 U.S. 610, 53 S.Ct. 402, 77 L.Ed. 984.

There was a compromise and settlement which resulted in a discharge of the OPA's claim against appellant for past violations and of appellant's claim of no violation. The dispute between the parties was bona fide, the claim was unliquidated because there was a difference of opinion as to the standards to be used in computing maximum prices; it was resolved and became binding on both debtor and creditor. Secs. 1278 et seq., Corbin on Contracts; see also Hensel v. Cahill, 179 Pa.Super. 114, 116 A.2d 99. The very motive for the settlement was the uncertainty of establishing specific overcharges on many of the items; the alleged mistake which appellant here urges, was an item in issue on the compromise, and may not now be used as a reason to dissect it. Corbin on Contracts, Sec. 1292. Furthermore, in view of the amount of damages pleaded in the complaint it is far from certain that had this item of $132,223.62 been discovered at that time the total sum appellant would have had to pay in full settlement of all and any violations would have been reduced by that much. The settlement was not animated by the assumed existence of that particular violation; it was incidental to the payment of an agreed sum of money for a multitude of violations and appellant's past conduct as a whole—and a sum which the trial court found to be more than reasonable under the circumstances. Grymes v. Sanders, 93 U.S. 55, 23 L.Ed. 798.

The "vital principle" behind the rule of law which prohibits appellant from

re-examining the *quid pro quo* of the settlement is that,

> "he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. * * * There is no rule more necessary to enforce good faith than that which compels a person to abstain from asserting claims which he has induced others to suppose he would not rely on." Backus v. United States, supra, 59 F.2d at pages 257–258.

The effect of a compromise and settlement effected by parties competent to contract is that of a judgment which can only be set aside in a direct proceeding. Ogglesby v. Attrell, 105 U.S. 605, 26 L.Ed. 1186, cf. United States v. International Building Co., 345 U.S. 502, 73 S.Ct. 807, 97 L.Ed. 1182.

We can see no distinction between seeking to reopen in this suit the compromised question of the amount of appellant's liability for the purpose of a tax deduction and seeking to reopen it for the purpose of directly recouping money paid in settlement, which appellant concedes it may not accomplish.

The bar which we conclude lies in appellant's path has nothing to do with collateral estoppel. Clearly that could not be the reason for the question of a violation of the maximum price for fabric A2391 was never litigated, never decided and no judgment ever entered. Fruehauf Trailer Co. v. Gilmore, 8 Cir., 167 F.2d 324; Trapp v. United States, 8 Cir., 177 F.2d 1; United States v. International Building Co., supra; Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898. The reason lies in the manifest unfairness and disruption of settled rights which would result from permitting a party to a completely executed agreement to reopen the issue of his liability in order to obtain a collateral benefit from the very consideration surrendered.

The findings of the trial court were that the violations which Juilliard compromised were the result of neglect and failure to take practicable precautions. The nature and character of the violations were particularly considered and so found. The burden of showing that the violations were innocent and the result of inadvertent error was not sustained by appellant. American Brewery v. United States, supra. Under Jerry Rossman, supra, and the latest authority from the Supreme Court in Tank Truck Rentals, Inc., v. C. I. R., 356 U.S. 30, 78 S.Ct. 507, 2 L.Ed.2d 562, and Hoover Motor Express Co. v. United States, 356 U.S. 38, 78 S.Ct. 511, 2 L.Ed.2d 568 allowance of these payments as a necessary and ordinary business expense would frustrate the policy of the statute and are consequently not recoverable by appellant.

The judgment of the district court is affirmed.

HINCKS, Circuit Judge (dissenting in part).

Of the $410,219.31 treble damage payment made by the appellant, I would hold that the sum of $132,223.62 was deductible as an ordinary and necessary business expense. In all other respects I agree with the disposition made by my brothers.

Judge Leibell's careful and complete findings establish clearly that in the negotiations which followed the filing of the OPA complaint a settlement formula had been tentatively agreed upon which took no account of overcharges on Juilliard's fabric No. A–2391; and that thereafter errors were discovered by Juilliard employees in the Juilliard report on its fabric No. A–2391 which were promptly reported to OPA. The resulting overcharges in No. A–2391 amounted to about $110,000 which OPA insisted be trebled and added to the tentative settlement. This item brought the total amount of the settlement up to $410,219.31. Thus the amount paid by Juilliard for the settlement clearly included the trebled overcharges on fabric

A–2391 as Judge Leibell repeatedly stated in his opinion.

Three months after the settlement had been completed, the appellant reported to OPA a revised basis for the computation of a higher maximum price on A–2391. This was based largely on fabric No. A–2313 which later was found by OPA to be a proper base period fabric to which A–2391 was similar. As a result, OPA allowed a ceiling price of $2.975 per yard for A–2391. Although the fact-basis for this higher ceiling had been in existence and available at and prior to the settlement with OPA, it was not advanced by the appellant nor given effect by OPA until after the settlement. If the overcharge on A–2391 had been computed on the basis of this higher (by 15¢ per yard) ceiling which was subsequently allowed, the amount of the overcharges on A–2391 would have been $44,074.54 less, and the trebled damages would have been $132,223.62 less, than the amounts included in the settlement.

I fully agree with my brothers that the appellant, having entered into a settlement with OPA, may not now recover back any part of the amount paid. But that is not to say that it is not entitled to a tax deduction. The allowability of a tax deduction as a business expense of damages paid to OPA depends upon whether the overcharges were made inadvertently or under such circumstances that the allowance of a deduction therefor would not frustrate any sharply defined statutory policy. Jerry Rossman Corp. v. Commissioner, 2 Cir., 175 F.2d 711, distinguished but not disapproved in Tank Truck Rentals, Inc., v. Commissioner, 356 U.S. 30, 78 S.Ct. 507, 2 L. Ed. 562.

In the circumstances of this case, the OPA's subsequent approval of the higher ceiling upon a basis which had existed before the settlement, serves as an authentic demonstration that the overcharges computed on the basis of the higher ceiling would have satisfied the statutory objectives. Consequently, the payments to the extent that they were based on the lower ceiling exceeded what was required to satisfy the statutory objective and a tax deduction in the amount of such excess ($132,223.62) would not frustrate national policy.