Raymond L. Klinck v. Commissioner. Klinck & Schaller, Inc. v. Commissioner.
Klinck v. Commissioner
Docket Nos. 20731, 22511, 20751, 22515.
United States Tax Court
1952 Tax Ct. Memo LEXIS 2; 11 T.C.M. (CCH) 1224; T.C.M. (RIA) 53007; December 31, 1952
Frank G. Raichle, Esq., 806 Genesee Bldg., Buffalo 2, N. Y. for the petitioners. Joseph F. Lawless, Esq., Robert Margolis, Esq., and R. P. Hertzog, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in petitioners' income tax liability and imposed penalties thereon as follows: Klinck & Schaller, Inc.
Declared
Excess
Value Excess
50% Fraud
Delinquency
Year
Income Tax
Profits Tax
Profits Tax
Penalty
Penalty
1933
$ 2,703.65
$ 1,351.83
1934
3,856.20
$ 602.38
2,243.04
1935
10,636.84
2,758.19
6,757.90
1936
10,369.82
1,755.21
6,062.52
1937
13,439.22
1,976.07
7,707.65
1938
167.43
83.72
1939
1,974.54
987.27
1940
1,007.18
503.59
1941
8,955.77
7,886.94
$ 2,739.87
9,833.99
1942
8,878.16
2,427.35
5,652.76
1943
7,600.41
57,521.80
10,886.44
38,004.33
1944
12,086.24
31,896.33
7,016.08
25,499.33
$7,974.08
1945
4,158.65
21,765.50
2,572.07
14,248.10
Totals
$85,834.11
$126,162.42
$25,641.81
$118,936.03
$7,974.08
*3 Raymond L. Klinck
50% Fraud
Year
Income Tax
Penalty
1933
$ 2,554.02
$ 1,277.01
1934
4,516.92
2,258.46
1935
23,882.76
11,941.38
1936
7,942.25
3,971.13
1937
12,459.48
6,229.74
1938
853.60
426.80
1939
1,775.87
887.94
1940
1,838.08
919.04
1941
19,392.13
9,696.06
1942
18,248.39
9,124.19
1943
49,014.36
24,507.18
1944
41,900.60
20,950.30
1945
22,222.62
11,111.31
Totals
$206,601.08
$103,300.54
Respondent has conceded certain issues. The corporate petitioner does not challenge as error the determination of a 25 per cent delinquency penalty imposed for failure to file an excess profits tax return for the year 1944. The remaining questions are: 1. Whether Klinck & Schaller, Inc. failed to report taxable income from the sale of hides, pelts, tallow and other slaughtering by-products for the years 1933 to 1945, inclusive. 2. Whether respondent correctly disallowed part of deductions taken for depreciation by Klinck & Schaller, Inc. during the years 1933 to 1945, inclusive. 3. (a) Whether tax returns of Klinck & Schaller, Inc. filed for any of the years 1933 to 1941, inclusive, were false and fraudulent with intent to *4 evade tax within the meaning of section 276(a), Internal Revenue Code, so that the period of limitations for assessment and collection of the tax would not commence to run. (b) Whether any part of the deficiencies asserted against Klinck & Schaller, Inc. for each of the taxable years 1933 to 1945, inclusive, is due to fraud with intent to evade tax within the meaning of section 293(b), Internal Revenue Code, so that the 50 per cent addition to tax liability may be imposed. 4. Whether Klinck & Schaller omitted from taxable income for the year 1944 Government subsidies totaling $18,948. 5. Whether various deductions taken for repairs were properly disallowed, as capital expenditures, for the years 1943 and 1944. 6. Whether insurance premiums on the lives of corporate officers were properly disallowed as a deductible corporate expense, where the corporation was beneficiary under the policies. 7. Whether payments to the United States Government allegedly representing profits from violations of O.P.A. ceiling prices, pursuant to a voluntary agreement, are deductible from gross income of Klinck & Schaller, Inc.
8. Whether Raymond *5 L. Klinck received preferential dividends from Klinck & Schaller, Inc. during the years 1933 to 1945, inclusive, which he failed to include in his taxable income. 9. Whether deposits made by Raymond L. Klinck in his Liberty Bank of Buffalo account during the taxable years 1933 to 1945, inclusive, included taxable income which he failed to report during those years. 10. (a) Whether the income tax returns of Raymond L. Klinck filed for the taxable years 1933 to 1942, inclusive, were false and fraudulent with intent to evade tax within the meaning of section 276(a) of the Internal Revenue Code, so that the period of limitations for assessment and collection of the tax would not commence to run. (b) Whether any part of the deficiencies asserted against Raymond L. Klinck for each of the taxable years 1933 to 1945, inclusive, is due to fraud with intent to evade tax within the meaning of section 293(b) of the Internal Revenue Code, so that the 50 per cent addition to tax liability may be imposed. Findings of Fact Some of the facts have been stipulated and are found accordingly. Klinck & Schaller, Inc. is a corporation organized under *6 the laws of the State of New York. During the years in controversy, it was engaged in the business of slaughtering and meat packing and maintained its plant in Buffalo, New York. It filed Federal tax returns with the collector for the twenty-eighth district of New York. Raymond L. Klinck is an individual residing in Buffalo, New York during all years in controversy. He filed Federal income tax returns with the collector for the twenty-eighth district of New York. The officers of Klinck & Schaller, Inc. (hereinafter called K & S) during all years in controversy were Jacob C. Schaller, President; Raymond L. Klinck, Treasurer; and Alfred C. Klinck, Secretary. They were also the directors of the corporation. Raymond L. Klinck was in charge of livestock purchases, Jacob C. Schaller was in charge of sales, and Alfred C. Klinck was in charge of killing operations. These officers received salaries from K & S during the period from January 1, 1931 through December 31, 1950 as follows: Jacob C.
Raymond L.
Alfred C.
Year
Schaller
Klinck
Klinck
1931
$ 8,302.92
$ 7,065.92
$3,988.66
1932
8,276.00
7,055.00
3,992.50
1933
5,200.00
5,200.00
3,120.00
1934
5,216.67
5,216.67
3,130.00
1935
5,233.33
5,233.33
3,140.00
1936
5,211.67
5,211.67
3,140.00
1937
5,233.33
5,233.33
3,140.00
1938
5,200.00
5,200.00
3,120.00
1939
5,200.00
5,200.00
3,120.00
1940
5,233.33
5,233.33
3,140.00
1941
5,216.67
5,216.67
3,130.00
1942
5,250.00
5,250.00
3,150.00
1943
5,200.00
5,200.00
3,120.00
1944
5,200.00
5,200.00
3,120.00
1945
15,600.00
15,600.00
9,360.00
1946
15,600.00
15,600.00
9,360.00
1947
15,600.00
15,600.00
9,360.00
1948
15,900.00
15,900.00
9,540.00
1949
15,600.00
15,600.00
9,360.00
1950
15,600.00
15,600.00
9,360.00
*7 The capital stock of K & S during these years consisted of 2,500 shares of no par value common stock and 1,600 shares of $100 par value preferred stock. The preferred stock was cumulative and preferred as to dividends to the extent of 7 per cent per annum. Raymond L. Klinck owned 750 shares of common stock, 717 shares of preferred stock, and was nominee of 500 shares of common and 70 shares of preferred stock owned by the estate of William H. Klinck, his father. Alfred C. Klinck owned 500 shares of common stock and 658 shares of preferred stock. Jacob C. Shaller owned 750 shares of common stock and 155 shares of preferred stock. During all years in controversy, the business of K & S included the purchase of cattle, lambs and calves and the sale of meat products resulting from their slaughter to retail markets and butchers in the City of Buffalo and its suburbs. Meat was the primary product. K & S also cured the hides and skins and rendered the tallow of these animals and sold these by-products, known as offal to dealers throughout the United States. During these years, sales of offal were made by means of sight draft, bill of lading or invoice and check. Purchasers were instructed *8 to split certain payments between K & S and R. L. Klinck. In other cases the entire proceeds were to be remitted to R. L. Klinck. The purchasers complied with these instructions. Proceeds from such sales totaling more than $400,000 were not received by K & S, but were deposited in R. L. Klinck's bank account at the Manufacturers & Traders Trust Company, Buffalo, New York. Sales in this same amount made by K & S from 1933 to 1945, inclusive, were omitted from its books and records and not reported in tax returns. Neither the bookkeeper nor the accountant of K & S had knowledge of these sales. These transactions were conducted under an arrangement between Raymond L. Klinck, Alfred C. Klinck and Jacob C. Schaller entered into at the time of the Bank Holiday in 1933. At that time and thereafter, farmers and cattle raisers increasingly demanded payment in cash or currency, and cash payment has subsequently developed as a frequent practice by meat packers in the Buffalo area. K & S buys most of its cattle at the Buffalo Livestock Exchange, making additional purchases from farmers along the Western New York countryside for cash to keep its plant operating at full capacity. After 1937, K *9 & S had a contract with the labor union representing its employees which guaranteed a 40 hour work week, such fixed cost making full operation desirable at all times. Purchases on the Livestock Exchange must be paid for on the day of purchase. Twenty-four hours is allowed purchasers who furnished a bond, but K & S had no bond during the years in controversy. Pursuant to the 1933 agreement among the officers, R. L. Klinck purchased cattle for cash or currency from personal funds, both on the Exchange and from individual farmers on the countryside, and received repayment for these advances from the proceeds of sales of offal. The account in R. L. Klinck's name at the Manufacturers and Traders Trust Company was opened pursuant to the agreement of March 1933, to serve as depositary for the checks and drafts from offal purchasers payable to the order of R. L. Klinck, by which he was repaid for his personal advances. The initial deposit in R. L. Klinck's account at the Manufacturers & Traders Trust Company was from I. J. Horstmann & Sons, Philadelphia, Pennsylvania, in payment for the purchase of certain skins. R. L. Klinck used this account as a revolving fund for the deposit of proceeds *10 from the sale of offal, payment of insurance premiums on corporate officers' lives, on behalf of K & S, payments to K & S other than for purchase of cattle, entertainment expenses and travel expenses on behalf of K & S, freight bills, and other minor expenses. The personal funds which Raymond L. Klinck advanced to K & S were part of sums accumulated during preceding years from executors' fees from the estate of his father, William H. Klinck, and his uncle, Frederick L. Klinck, moneys periodically withdrawn from his uncle's estate in anticipation of his legacy before the undistributed balance was specifically waived, and savings from previous years. These sums were kept in cash in a safety deposit box in his name. William H. Klinck died on or about August 21, 1927, naming Raymond L. Klinck and his other two sons executors of his estate. His last will and testament bequeathed essentially his entire estate in trust to his widow for her life, with the remainder over to his three sons and daughter upon the widow's death or remarriage and with specific bequests of $5,000 to be paid to each of five named grandchildren at that time, including the three children of Raymond L. Klinck. William *11 H. Klinck's widow was still alive and possessed of her life interest as of October 1, 1951. There has been no accounting and no executors' fees have been awarded by the Surrogate in this estate. Raymond Klinck received $6,000 from the estate of William H. Klinck as one of the three executors, whose total fees are listed at $17,213.22. Frederick F. Klinck, uncle of Raymond Klinck, died on or about April 7, 1929. Raymond Klinck was bequeathed $5,000 as one of the three executors of the estate, a specific legacy of $50,000 and one-fifth of the residue. An intermediate account filed by the executors revealed that the residue had been consumed by April 5, 1934. As a result of objections to the intermediate accounting by various legatees, a stipulation was filed on June 15, 1934 in which Raymond L. Klinck waived the undistributed balance of his unpaid specific legacy of $50,000. Raymond L. Klinck received at least $5,000 from the estate of his uncle, Frederick F. Klinck. The diversion of proceeds from the sale of offal to R. L. Klinck and any agreement of which it was a part were never formally authorized by a meeting of the officers or directors of K & S during 1933. Nor was there ever *12 any formal accounting by R. L. Klinck to the corporation or its other officers from 1933 to 1945 for the sums remitted directly to him. Raymond L. Klinck, Jacob C. Schaller and Alfred C. Klinck conferred concerning policies and steps in relation to the business of K & S, and generally kept each other informed concerning what each was doing. Business policies and practices were determined in the course of these conferences. On January 1, 1933, K & S had on hand approximately $43,700 of cash, $47,000 of accounts receivable and $17,000 of liabilities. As of December 31, 1933, K & S had on hand approximately $15,800 of cash, $29,800 of accounts receivable, $39,500 of investments and $22,600 of liabilities. From January 1, 1933 to December 31, 1945 K & S had on hand stocks and bonds of other corporations of a value ranging from $30,000 to $105,900. Neither Raymond L. Klinck nor K & S attempted to conceal the existence of the account opened in the name of Raymond Klinck at the Manufacturers and Traders Trust Company. The bankbook pertaining to that account was given to the revenue agent who came to the K & S plant in 1945 to examine the corporate tax return and corporate records for *13 the year 1943. Various entries on the books of K & S referred to the account in Raymond Klinck's name at the Manufacturers and Traders Trust Company (hereinafter sometimes referred to as M & T). All of the accounting records and a substantial number of all other books and records of K & S for the years 1933 to 1942, inclusive, were donated to the waste paper scrap drive prior to the revenue agent's audit in 1945. During 1943, 1944 and 1945 K & S custom-slaughtered cattle for various private concerns. The arrangement was such that cattle purchased and owned by these concerns were brought to the K & S plant and slaughtered there for a fee. At no time did these animals have any cost to K & S. The corporate petitioner submitted to the Reconstruction Finance Corporation and Defense Supplies Corporation statements, signed and sworn to, setting forth the number of cattle slaughtered by K & S on their own account, custom-slaughtered for others, and purchased at other than public stockyards and markets as a basis for subsidy claims. Subsidy claims had to be substantiated by production of purchase invoices. It was customary not to give invoices or receipts when cattle were purchased for cash; *14 the cattle sold served as their own invoice. Subsidy claim investigators usually check on claims long after these cattle had been slaughtered. It was customary and reasonable not to make subsidy claims to the R.F.C. based on cattle purchased for cash. The count of the number of cattle slaughtered made by the Buffalo City Health Department included both cattle owned by K & S on their own account and cattle custom-slaughtered for others. The public records of the Health Department showed an excess of 306 cattle slaughtered in 1945 and 102 cattle slaughtered in 1944 beyond the total number purchased by K & S for its own account and custom-slaughtered for others. Ninety per cent of the amounts deposited in the M & T account during these years and during 1942 and 1943 represented repayments of cattle purchase loans from K & S to Raymond L. Klinck. Ten per cent of the amounts deposited in the M & T account during these years represented unreported income not offset by expenditures deductible by K & S. Entries were omitted from the K & S minute book, and many of those recorded were not made at the proper times or in proper sequence. The K & S accounting records were also incomplete. *15 R. L. Klinck, A. C. Klinck, J. C. Schaller and K & S maintained safety deposit vaults at the Liberty Bank & Trust Company, in Buffalo, New York during the years in controversy and had access to them on various occasions. R. L. Klinck also maintained a safety deposit vault at the Manufacturers and Traders Trust Company during that period, which he visited on various occasions. During the years 1933 to 1945, inclusive, insurance policies of which the corporation was the beneficiary were carried on the lives of the corporate officers and premiums were paid on these policies in cash. During this same period R. L. Klinck carried personal life insurance payable to members of his family in the amount of $94,500. Respondent erroneously included as unreported income to both K & S and R. L. Klinck the amounts of insurance premiums paid on the lives of the officers of K & S during each of the years in controversy. During the taxable year 1943, K & S paid $12,500 to the Office of Price Administration for violation of the maximum price regulations relating to slaughtering overcharges. The $12,500 payment by K & S to the O.P.A. in 1943 was neither a fine nor a penalty, but a voluntary settlement *16 with the enforcement attorney of a potential controversy, made pursuant to a prior understanding. The allowance of this payment as a deduction to K & S did not frustrate the policy of any statute or regulation under which the enforcement attorney was acting. K & S did not willfully violate any regulations of the O.P.A.
In 1923 and 1924, Raymond L. Klinck talked with revenue agents who were then examining certain K & S tax returns and agreed with them upon rates of depreciation. During all of the years involved in these cases, K & S depreciated its plant and equipment at the rate agreed upon with those agents as satisfactory. No criticism or complaint of the rate was made by agents who examined returns of K & S in 1936 and 1940. An appraisal report prepared for K & S early in 1944 by the American Appraisal Company revealed that the future useful life of the K & S plant and equipment was greater than the rate of depreciation then used by K & S would indicate. The rate of depreciation shown on the K & S tax returns for the years prior to 1944 was proper. The rate of depreciation used by K & S for the years 1944 and 1945 was excessive, and was properly disallowed by respondent. K & *17 S improperly charged to expense rather than to capital expenditure the cost of a concrete driveway, other building improvements and machinery purchases totaling $9,347.48 on its tax return for the year 1943 and $8,236.77 on its return for 1944. Raymond L. Klinck maintained a personal bank account during the years in controversy at the Liberty Bank in Buffalo. Deposits were made therein in the following amounts during these years: Total
Other than
Year
Deposit
Currency
1933 (7/14 to 12/29)
$ 7,267.68
Unknown
1934
9,999.77
Unknown
1935
13,134.54
Unknown
1936
10,586.51
Unknown
1937
15,878.08
Unknown
1938
11,315.60
Unknown
1939
11,854.50
Unknown
1940
15,739.91
$ 9,151.91
1941
13,319.99
5,299.99
1942
12,293.11
4,763.11
1943
11,384.63
5,764.63
1944
14,380.15
10,760.15
1945
15,533.50
Unknown
Total
$162,687.87 This account was used by Raymond Klinck for loans to various people, payment of insurance premiums, and for payment of personal expenses. Raymond L. Klinck was originally charged with unreported income in connection with deposits in his personal account at the Liberty Bank in Buffalo totaling $11,384.63 for 1943, *18 $11,305.72 for 1944, and $3,308.50 for 1945. A number of the claims originally set up as additional income in the deficiency notice have been withdrawn by stipulation. Of the remaining totals, a deposit of $269.61 and $770 of a $1,000 deposit made in January 1943, represented payments by a Mr. Strebel and a Mr. O'Brien toward the expense of a party given jointly with Raymond Klinck on behalf of their daughters. The sum of $775 deposited in March 1944, represented an advance by Klinck's mother-in-law to his wife for the payment of insurance premiums. The sum of $600 deposited in January 1944, represented a repayment by the Estate of Charles H. Williamson for an advance made by Klinck. Raymond L. Klinck had other legitimate sources, other than unreported income, from which the deposits in his Liberty Bank account were derived, including non-profit transactions with relatives and friends and repayments and payments by K & S for travel and entertainment expenses on behalf of the corporation. Raymond Klinck has substantiated the deposits in his Liberty Bank account. During the years in controversy, Raymond L. Klinck belonged to various prominent social clubs and participated in them actively. *19 He supported his brother, Gilbert Klinck, and his mother, Julia Klinck, loaned money to various friends and relatives, and sent his children to private schools and colleges. Specific bequests of $5,000 in the will of William H. Klinck were intended as an educational fund for each of his grandchildren, and were used for that purpose by R. L. Klinck for his children. There is no express provision for an educational fund for William H. Klinck's grandchildren in his will. K & S did not file false or fraudulent returns with intent to evade tax for the years 1933 to 1945, inclusive. No part of any deficiencies for any of the years in which deficiencies exist is due to fraud with intent to evade tax. Raymond L. Klinck did not file false or fraudulent returns with intent to evade tax for the years 1933 to 1945, inclusive. No part of any deficiencies is due to fraud with intent to evade tax. Opinion Although the issues are numerous, they are primarily of a factual character. For convenience, we take up first the assertions of fraud against both petitioners, the individual and the corporation. In addition to the relationship of fraud to respondent's determination of penalties, all issues *20 relating to the years prior to 1942 for the corporation and prior to 1943 for petitioner Raymond L. Klinck revolve about this question in the light of the bar of the statute of limitations. Section 276 (a), Internal Revenue Code. I. Our finding of fact as to the two petitioners effectually disposes of the fraud question. Respondent has utterly failed to sustain his burden in this respect. A. C. Griffith, 11 B.T.A. 565. It is impossible to say that the reasons offered for the failure to report the claimed corporate income and the deposits in the individual petitioner's bank accounts do not adequately explain these items. If in addition to the deposits themselves, there were some affirmative evidence of an intention to defraud or even of such implications of fraudulent conduct as participation in illegal activities, it was encumbent upon respondent to produce it. Upon the entire record we cannot make the necessary finding as to either petitioner that any part of the deficiencies was due to fraud. II. The explanation of petitioner Raymond L. Klinck as to the Manufacturers and Traders or "M & T" Bank account, we find largely supported by external *21 and disinterested evidence. The claim is that as far back as 1933 Klinck advanced funds to the corporate petitioner for the purchase of cattle as to some part of which immediate cash was essential; and that these advances were repaid as the sales of by-products, such as hides and tallow, were paid for by the corporation's customers. Although the figures are not agreed upon for the year 1943, there is an apparent consensus that as to 1944 and 1945 the excess of cattle slaughtered according to the public records of the City of Buffalo over those shown by the corporate books to have been purchased by check was [1] 408. Accepting $150 a head as the price paid, in which respondent appears to concur at least for purposes of calculation, a total of some $61,000 was apparently advanced out of this account for cash purchases in the two years together. In the same two years payments from customers of about $67,500 were deposited in the account. Other expenses of the corporation paid by petitioner Klinck, although not necessarily deductible by it, could easily account for the difference, persuading us that the account was not to any extent Raymond Klinck's personal property. *22 These figures, to be sure, are a combination of the two years. But year-end carry-overs, delays in entering figures, and particularly the short duration of the practice in 1945 [2] lead us to accept the totals as being adequately precise. The testimony of petitioner Raymond Klinck as to the origin and operation of the M & T account was corroborated by his brother, as well as by the respected president of petitioner corporation. Respondent expressly disavows any contention that either of the latter was the recipient of unreported income. In order accordingly to assume that petitioner Raymond Klinck received income from the M & T account in excess of his other receipts from the corporation, it would be necessary to assume that he was defrauding these witnesses, both of whom were officers and stockholders of petitioner corporation and as such entitled to participate both in salaries and in dividends. Any bias they might be thought to have because of their desire to protect the corporation against tax claims is hence more than overcome by their own financial interests *23 which would be adverse to Raymond Klinck's as to whether the M & T account was in all respects adequately accounted for. [3]
A further basis for respondent's claim against the individual petitioner is the deposits in his personal bank account at the Liberty Bank. Before the hearing of the case was concluded, respondent had stipulated *24 that well over half of these deposits did not represent taxable income. A number of additional items were explained by petitioner Raymond Klinck in detail and, except for the charge that the deposits represented illicit withdrawals from corporate funds, respondent has made no assertion of any source from which these items could have been derived which would constitute taxable income. In the light of petitioner's explicit testimony under oath and in the absence of countervailing evidence on the part of respondent, we conclude that petitioner Raymond L. Klinck has sustained his burden of showing that his income was not understated for any of the three open years. III. Petitioners concede that the entries in the M & T account should have passed through the corporate books. [4] The result is that as to the corporate petitioner the absence of adequate records leaves it open to the charge that some part of the receipts entered in the M & T account was in excess of payments for cattle purchases, and this is essentially as true for the years 1942 and 1943 as for 1944 and 1945. We have already discussed the discrepancy of approximately 10 per cent between the Public Health records and the *25 amount supposedly expended for cattle purchases for the latter two years. Applying the same ratio to the other two years, we have concluded that for all of the open years of the corporation 10 per cent of the deposits in the M & T account represented unreported income to it not offset by expenditures and have so found as a fact. We reach this conclusion because of the absence of adequate records and the necessity for making some determination, notwithstanding that there is no substantial evidence from which an actual figure can be derived. Cohan v. Commissioner (C.A. 2), 39 Fed. (2d) 540. IV. Petitioner deducted as ordinary and necessary business expense insurance premiums paid on policies on the lives of its officers of which it was the beneficiary. These deductions are expressly forbidden by Internal Revenue Code, section 24 (a) (4). They must accordingly be disallowed. Petitioner contends that respondent's counsel conceded this issue at the hearing. We do not so read the record. The insurance premiums were involved in several different *26 ways, having been paid to some extent at least out of the M & T account. There is apparently no dispute that such premiums were claimed as deductions and that as a matter of law the claim must be rejected. We regard the concession of the respondent as applying only to the factual questions and not as conceding the legal issue. In this respect the deficiency is approved. V. For the open years petitioner entirely failed to sustain its burden that certain claimed repairs to its plant for which it took deductions were not in fact capital improvements or additions. On this issue the deficiency is approved. VI. For many years prior to 1944, the corporate petitioner's deductions for depreciation were uniform and apparently satisfactory to respondent's representatives. Only in that year did it become apparent that the deductions were excessive. Depreciation is to be determined according to circumstances as they are known to exist at the end of the current year. Regulations 111, section 23 (1)-5. It seems to us to follow that the claimed depreciation for 1942 and 1943 should be allowed, but that as to 1944 and 1945 petitioner should have known that the claim was excessive. The deficiency *27 is accordingly disapproved for the first two open years but not for the last two. VII. In his brief respondent claims that a part of the deficiency was due to petitioner's failure to report as income certain subsidies received from R.F.C. in the year 1944. Petitioner insists that this contention may not now be permitted as being outside of the issues framed by the pleadings. We are required to concur in petitioner's position. Claims not made by one side or the other in original or amended pleadings are not to be employed as a basis for our disposition. Warner G. Baird, 42 B.T.A. 970; Wentworth Manufacturing Co., 6 T.C. 1201; The Maltine Co., 5 T.C. 1265. Here respondent first determined, as shown by the deficiency notice, that "(a) Sales of hides, skins, pelts and tallows, in the amount of $68,900.70, were omitted from income reported for the year 1944." This was alleged as error in the petition. In the affirmative allegations of his answer respondent then proceeded to particularize this item and reduced the amount to $49,952.70, again alleged to have been "received by it [the corporate petitioner] during 1944 from the sales of hides, *28 skins, pelts and tallow belonging to it, which amount of $49,952.70 was deposited in the personal bank account of Raymond L. Klinck, Treasurer, at the Manufacturers Traders & Trust Co. * * *." To this, petitioner replied by admitting that its tax returns "did not include the sum of $49,952.70 * * * but denies that the same constituted taxable income * * *." There is accordingly in the entire record of the pleadings no reference whatever to the R.F.C. subsidies, nor to their amount; nor in fact under the theory of the original deficiency notice any room for their inclusion. This is especially remarkable as they are now referred to in respondent's brief as "manipulations" discovered upon an examination of the books. Accepting the necessity that the purpose of pleadings is to advise the parties, counsel, and the Tax Court of the issues, and that as to a matter not even referred to indirectly in the pleadings its assertion in brief comes too late and fails to present the opposing party with an adequate opportunity to support its position by evidence, we conclude that no amount may be charged against petitioner corporation on account of R.F.C. subsidies, notwithstanding that the record *29 might support a finding that such subsidies were in fact received. [5]
VIII. Another issue arises as a result of petitioner's deduction as ordinary and necessary business expense of payments to O.P.A. made in 1943 on account of overcharges. The testimony of the O.P.A. enforcement officer himself confirmed petitioner's evidence that the overcharges in question were known to, and in fact made by agreement with, the enforcement officer with the understanding that at the end of the year any profit made by petitioner corporation on such sales would be computed and paid to the United States. The purpose of the agreement being on the one hand to maintain petitioner in the slaughtering business to avoid unnecessary hardship on the local public interest, but on the other hand to assure that petitioner could reap no profit from any excessive charges, it is impossible to see how any well-defined legislative purpose would be frustrated by the allowance of such a deduction. See Jerry Rossman Corp. v. Commissioner (C.A. 2), 175 F. 2d 711. That *30 this was the situation cannot be doubted in the light of the disinterested testimony of the O.P.A. enforcement officer. Under these circumstances the deduction should be allowed. Decisions will be entered under Rule 50. Footnotes
1. Petitioner claims an excess for 1943 of 504. No figure is cited by respondent.↩
2. Cash purchases were discontinued after they were called into question by the revenue agent in May of 1945.↩
3. Respondent seeks to show that the M & T account was used to pay officers' salaries and dividends by comparing amounts withdrawn from the account with smaller sums deposited concurrently by petitioner in his personal account. But if so the balance must have been paid to the other officers and stockholders which seems to us an inadmissible conjecture in the light of respondent's position that Messrs. Schaller and Alfred Klinck were not involved in the scheme. Incidentally, if these withdrawals were merely for the payment of officers' salaries actually and properly deducted by petitioner corporation and actually reported as income by all three officers - and there is no contrary evidence - then the most that can be said is that the failure to keep adequate records was improper and negligent but no ground for claiming fraud nor even an additional tax.↩
4. Respondent did not determine the 5 per cent negligence penalty for any of the years in controversy.↩
5. Assuming that respondent intended to rely on any such testimony, there was no motion to amend the pleadings to conform to the proof.↩