## CURRY v. CURRY et al.

No. 6339.

United States Court of Appeals for the District of Columbia.

Argued Jan. 11, 1935.

Decided July 22, 1935.

Francis W. Hill, Jr., of Washington, D. C., for appellant.

Henry I. Quinn and Austin F. Canfield, both of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

PER CURIAM.

This appeal presents a matrimonial controversy somewhat complicated by the interstate traffic in marriage and divorce.

The original parties, being residents of the District of Columbia, married in Washington, and lived together here for seventeen years, when a separation occurred. Two years later the marriage is alleged to have been dissolved by a Nevada decree of divorce; three months after which the husband married the third party in Virginia; while the present plaintiff, who is the first wife, is now living in Maryland, where the husband avers she is so domiciled as to preclude this suit; while she alleges, and the trial court finds, that she is merely sojourning in Maryland, in a manner leaving her free to bring this suit in this jurisdiction so far as domicile is concerned.

Mr. Curry and his first wife, Frances, were married in Washington in 1912, where they lived, without birth of children, until January 1929, when the husband left their residence and never thereafter returned.

The second wife, Lillian, appeared on the scene as the familiar friend and frequent visitor of Frances, who alleges that in 1927 or 1928 Lillian transferred her affection to the husband, which resulted in the Nevada divorce and the second marriage.

On July 25, 1930, the husband and Frances, each being represented by counsel, entered into three written separation agreements under seal, and witnessed by the attorneys, together with an alleged oral contract rendering the beneficial interest passing to Frances under the separation agreements contingent upon her first procuring a Nevada divorce so that the husband might marry Lillian.

By these contracts the husband agreed to convey their residence in the city of Washington to Frances, with its furniture and fittings; and to pay $150 per month until her death or remarriage; both

parties relinquishing all other property rights inter sese.

During the period of separation, from January, 1929, when the husband left home, until August, 1930, when the wife left for Reno, he made payments of money for her support at a theoretical rate of $150 per month, though such payments appear to have been occasionally diminished or withheld, as the wife alleges, to speed her on the road to Reno, and to force her to procure the divorce.

But Frances having arrived at Reno in August, in November her bill for divorce was filed, was heard, a decree a vinculo was granted, and she permanently left that jurisdiction, all on the same day, being November 15, 1930. The husband entered an appearance and filed an answer in that proceeding by an attorney, but did not personally appear, and no evidence was offered or defense made in his behalf.

Thereupon Frances returned to Washington, where the property was transferred to her; the $150 per month paid to her; and three months later the husband married Lillian in Virginia, taking up his residence with her in Washington, where they have ever since lived, so that the District of Columbia has been the only matrimonial domicile of both marriages. This arrangement continued until December, 1931, when the husband stopped the monthly payments to Frances because of financial reverses and inability to maintain them, as he alleges. Whereupon Frances was obliged to mortgage the house, and being unable to meet the obligations thereon, it was sold in foreclosure, producing no surplus for her.

She subsequently obtained a judgment against the husband for arrears due her under the separation agreement, but being unable to satisfy the judgment, she found herself penniless, and thereupon discovered that her Nevada divorce was invalid because of coercion practiced upon her by the husband; because of fraud practiced by both parties upon the Nevada court; and because of lack of domicile of either party within the jurisdiction of that court. And while there is much in the record to indicate that her proceedings and her attitude constituted a recognition of an unwelcome but established situation; and that her husband was outspoken, both to her brother and herself, in his determination never to live with her after his departure from home in 1929; nothing appears which amounts to legal duress or coercion. On the contrary, Frances acquiesced in the whole arrangement, so long as the money was forthcoming, and she could retain the property. Throughout the controversy she had the benefit of counsel who is one of the most experienced, capable, and militant members of the bar, in addition to the advice and assistance of her brother.

■ She apparently had a cause of action in this jurisdiction for a limited divorce, with alimony, or for a separate maintenance, yet she traveled 3,000 miles alone, secured the advice of additional counsel, brought her suit, and pursued it to judgment, all of which was done under circumstances which clearly indicate, as the trial court finds, that she knew the husband was about to marry Lillian. She then returned to Washington; took title to the real estate; possession of the personal estate; and stood silent while the second marriage occurred; and the parties thereto took up their residence in Washington. She acquiesced in all of this for a year, during which the husband paid twelve monthly installments of $150; then in December, 1931, he paid $75 on account; nothing more until December, 1932, when he paid $50 "without prejudice," whatever that may mean; and nothing since. Frances finding that she can get no further supplies, either under her contracts or her judgments, files the present bill, contending that the divorce she sought and obtained in Nevada is void for fraud; the separation agreements are void as against public policy; and that she is entitled to another divorce here, with alimony. The provision that the husband shall pay her $150 per month is carried into the Nevada decree, and whatever invalidity, if any, there may be in the separation agreements is not asserted by the husband, who admits his obligation, but denies his ability to pay. Frances, in the present bill, professes no purpose of reconciliation, or expectation of living with the husband, but seeks in one proceeding to have her marriage both re-established and dissolved in order to secure a financial provision enforceable by the extraordinary process for contempt, where she now has such a provision enforceable by the usual processes of law. But actions for divorce involve public interests as well as private rights, and while

courts should see that they are not granted without sufficient evidence, they should never be lightly set aside. "A court of equity may well pause before gratifying the malignity of one" party to a divorce against the other with whom he has no intention of living, but whom he wishes to injure and embarrass. Whittaker v. Whittaker, 51 Ill. App. 263.

In this case the legal condition of which the plaintiff complains was brought about by her collusion, connivance, and active co-operation. At the time she went to Reno, if she had proved here the assertions she makes now and made then, the court here would have afforded her relief, though probably not with the same appearance of financial liberality as the arrangements she made for herself.

In the Nevada proceedings, Frances was the active, moving, and present party; the judgment of that court was made at her request, by her consent, and upon her sworn assertion of a state of fact touching residence which she now under oath denies. But she cannot be heard in this court to set up her own fraud and collusion in that proceeding to relieve herself of a failure of consideration in the financial transactions which she now says produced her fraud and collusion.

■ Where a party litigant has invoked the jurisdiction of a court, and the other party has voluntarily appeared and submitted thereto, it is not consonant with ordinary conceptions of justice for another court to countenance an attempt to repudiate that jurisdiction, particularly when such attempt involves considerable sums of money expended, and the unsettlement of domestic relations created under color of the judgment. Loud v. Loud, 129 Mass. 14; Chapman v. Chapman, 224 Mass. 427, 113 N. E. 359, L. R. A. 1916F, 528; Parmelee v. Hutchins, 238 Mass. 561, 131 N. E. 443; Kaufman v. Kaufman, 177 App. Div. 162, 163 N. Y. S. 566; Kelly v. Kelly, 118 Va. 376, 87 S. E. 567; Harding v. Harding, 198 U. S. 317, 25 S. Ct. 679, 49 L. Ed. 1066.

And, of course, this salutary principle is of general application, not confined to the active parties in matters of divorce, as in the cases above cited, for it can never lie with a litigant either by passive consent, or by affirmative action, to lead a court to find a fact justified and fit to be carried into judgment, and then to contend in another court that the same fact at the same time and within his own knowledge, was otherwise and competent to support a contrary judgment.

■ For a consent decree, within the purview of the pleadings and the scope of the issues, is valid and binding upon all parties consenting, open neither to direct appeal nor collateral attack. "A fortiori, neither party can deny its effect as a bar of a subsequent suit on any claim included in the decree." Nashville, etc., Railway Company v. United States, 113 U. S. 261, 266, 5 S. Ct. 460, 462, 28 L. Ed. 971. And so, even where the consent decree is of an interlocutory nature. In re Metropolitan Railway Receivership, 208 U. S. 90, 28 S. Ct. 219, 52 L. Ed. 403; Parish v. McGowan, 39 App. D. C. 184, 201.

■ A statement in a record on appeal that a party has consented to a decree is equivalent to an admission that the facts exist on which the decree rests, and the only question open is whether that decree could be entered in that cause on any state of facts. Pacific R. Co. v. Ketchum, 101 U. S. 289, 296, 297, 25 L. Ed. 932; United States v. Babbitt, 104 U. S. 767, 26 L. Ed. 921; Ganss v. Goldenberg, 39 App. D. C. 597, 599. And this principle has long been established in the English courts, where a decree taken by consent cannot be set aside by a bill of review, or a bill in the nature thereof, except for clerical error or for something inserted but not consented to. 2 Daniel, Ch. Pr. 1576. Or, as the Lord Chancellor put it in the time of Charles II, there can be neither legal error nor injustice in a consent decree. Webb v. Webb, 3 Swanst. 656. And the learned commentator on the Duchess of Kingston's Case expressed the underlying principle that "it is wise to provide certain means by which a man may be concluded, not from saying the truth, but from asserting that what has become accredited as truth by his act is false." 2 Smith's Leading Cases at p. 745.

The decree of the Supreme Court of the District of Columbia is affirmed.

The opinion in this case was prepared by Judge HITZ and then concurred in by the other members of the court, but was not printed for filing until after his death.