**A. D. JUILLIARD & CO., Inc., Plaintiff,**

v.

**James W. JOHNSON, Collector of Internal Revenue for the Third District of New York, Defendant.**

United States District Court
S. D. New York.

Oct. 22, 1957.

---

Stroock & Stroock & Lavan, New York City, for plaintiff (Stephen Ailes and William C. Hill of Steptoe & Johnson, Washington, D. C., Martin D. Eile of Stroock & Stroock & Lavan, New York City, of counsel).

Paul W. Williams, U. S. Atty., for S. D. of New York, New York City, for the United States (George M. Vetter, Jr., Asst. U. S. Atty., New York City, of counsel).

LEIBELL, District Judge.

I am filing, together with this opinion, Findings of Fact and Conclusions of Law. The typewritten record of the trial testimony covered 1,039 pages, plus 248 pages of the Schwarz deposition. Mr. Schwarz was a former Vice-President of Juilliard. In addition, several hundred exhibits were received in evidence. The Findings of Fact are quite detailed, and familiarity with the Findings is assumed. In this opinion I shall discuss the principal legal questions raised by counsel. The facts will, of course, be referred to, but in an abridged form, to the extent that may be necessary to show the applicability of certain principles of law laid down in the decided cases.

In its complaint in this action the plaintiff, Juilliard, alleged three causes of action for refunds of part of its excess profits taxes paid for the years 1942, 1943 and 1944. But only the second cause of action need be considered, because it combined the 1942 and 1944 claims for refunds and reasserted them for the year 1943, which the parties have stipulated is the applicable tax year.

The Commissioner of Internal Revenue disallowed two items claimed to be deductible as "ordinary and necessary [business] expenses" under Section 23 (a) (1) (A) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(a) (1) (A). The larger item, $410,219.31, represented a payment made by Juilliard to the Treasurer of the United States on January 29, 1943, in settlement of a treble damage action instituted by OPA against Juilliard on November 19, 1942, for violations of Maximum Price Regulation 163 (MPR 163). The smaller item, $4,184.63, represented a net payment of overcharges for other violations of the Regulation, subsequently reported by Juilliard to the OPA and paid January 21, 1944. Those two items, if they had been allowed, would have resulted in the reduction of Juilliard's excess profits taxes for 1943 by $335,667.20, the amount claimed as a refund (plus interest) in the second cause of action herein.

The Office of Price Administration instituted an action against Juilliard, in this Court on November 19, 1942, charging that during 1942 Juilliard had violated MPR 163 and had overcharged its customers approximately $250,000, on which treble damages were sought. That action was finally settled January 29, 1943, and Juilliard paid to the Treasurer of the United States $410,219.31, three times overcharges of $136,739.77, as calculated at the time the settlement was made. In 1943 while making a recanvass of its records Juilliard discovered certain additional overcharges and, after taking a credit for certain undercharges, paid over a net balance of $4,184.63 to the United States Treasury on January 21, 1944, without the exaction of any treble damage penalty by OPA. Just how this net figure was arrived at will be hereinafter discussed.

Juilliard claims that the overcharges of $136,739.77 were innocently made, were due to a misunderstanding of the Regulation or to inadvertence, and were not the result of any wilful violation of the OPA Regulations or the result of any negligence on Juilliard's part in calculating the ceiling prices permitted by the OPA Regulations, or any failure on Juilliard's part to take practicable precautions against violating the Regulation, MPR 163. The same contention is made in reference to the overcharges involved in the payment of $4,184.63.

In the case at bar the plaintiff also contends that it was so harassed and its business was so jeopardized by the publicity attending the OPA violations suit, that plaintiff was forced to settle and paid the treble damages under duress. Plaintiff was restrained by the provisions of the "order to show cause" issued November 19, 1942, from selling twenty-

seven specified styles of woolen and worsted goods, until new reports on ceiling prices had been submitted to the OPA and approved. Over $300,000 of Juilliard's outstanding accounts were held up by the OPA suit. To meet that situation plaintiff asked and was permitted to receive and deposit in a separate fund the amounts due it on outstanding accounts from customers to whom it had sold the challenged fabrics.

There was considerable testimony on the issue of duress. Those who were responsible for the institution of the OPA action against Juilliard undoubtedly made every effort to publicize the action as the first major suit against an OPA violator. Juilliard had violated the Regulation in fixing the ceiling price on most of its woolen and worsted fabrics for women's wear, especially on its best sellers. The OPA would not agree to any payment in settlement of the overcharges unless the settlement figure was calculated on a treble damage basis. That was what the Act, at the time, seemed to impose, and it was also the policy the OPA intended to follow. But in calculating the overcharges the OPA was considerate, especially in allowing the so-called Stottville markup, and in doing so treated that phase of Juilliard's ceiling price problem as a hardship case, as set forth in some detail in the Findings of Fact. Whatever "duress" resulted from the OPA suit had its origin in Juilliard's violation of MPR 163, and was a direct consequence of the application thereto of the legal sanctions provided in Section 205(a) and (e) of the Emergency Price Control Act, 50 U.S. C.A.Appendix, § 925.

 The fact that the OPA January 29, 1943 settlement involved payment of treble damages by the taxpayer Juilliard, while important, is not of itself dispositive of the case. It only labels the payment made by Juilliard as a "penalty". The important question is whether the taxpayer's violation of the statute or regulation was innocent and inadvertent, or was wilful or the result of negligence and the failure to take practicable precautions to avoid the occurrence of the violation. In every case that question must be decided "ad hoc", as Judge Hand observed in Jerry Rossman Corporation v. Commissioner of Int. Rev., 2 Cir., 175 F.2d 711, 713. This court has followed that course in the case at bar.

 Where a treble damage payment in an OPA action is made pursuant to a court adjudication that the overcharges had been made knowingly, and wilfully exacted, [Lentin v. Commissioner of Internal Revenue, 7 Cir., 226 F.2d 695] or that they were the result of taxpayer's negligence or the failure to take practicable precaution to avoid the occurrence of the overcharge, the doctrine of "res judicata" comes into play. In a later tax case, where the amount paid by the violator is claimed as a deductible business expense, the court will take the penalty nature of the payment as already adjudicated. George Schaefer & Sons v. Commissioner of Int. Rev., 2 Cir., 209 F.2d 440, 441.

Juilliard's attorney, Mr. Burke, negotiated the settlement and Juilliard's Board of Directors approved it. The settlement provided for treble damages. The OPA as part of the negotiation of the settlement, waived any claim for the first period of MPR 163 (June 22 to September 8, 1942), and limited its claim to the so-called second period, which followed the adoption of Amendment 4 of the Regulation, effective September 8, 1942. As part of the settlement plaintiff was allowed the so-called Stottville markup of 20%, instead of being limited to a company-wide markup of 9.8%. But, after all these concessions, the OPA insisted that the balance of the overcharges be trebled.

 If treble damages are demanded and paid by an alleged violator of an OPA price regulation, the amount thereof is, as a general rule, considered a penalty and is not deductible as "an ordinary and necessary business expense" in calculating the violator's Federal taxes.

The reason for the disallowance of any deduction of a penalty from the violator's income or excess profits taxes is that any such deduction would reduce the amount of the penalty payment, destroy the punitive effect of the payment as a deterrent, and would frustrate the policies of the Emergency Price Control Act. Commissioner of Internal Revenue v. Heininger, 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171. To establish the right to a deduction the taxpayer has the burden of showing that the violation of the Regulations was innocent and was the result of an inadvertent error. American Brewery v. United States, 4 Cir., 223 F. 2d 43, 46. If the violation of the OPA Regulation was wilful, or the result of negligence or of a failure on the part of the violator to take practicable precautions against the occurrence of the violation, the deduction will not be allowed. Jerry Rossman Corporation v. Commissioner of Int. Rev., supra.

■ Until The Chandler amendment in June 1944, the courts had no alternative but to impose treble damages and no equitable defense of the lack of wilfulness or of inadvertence could be considered. Bowles v. American Stores, 78 U.S.App.D.C. 238, 139 F.2d 377, certiorari denied 322 U.S. 730, 64 S.Ct. 947, 88 L.Ed. 1565; Bowles v. Indianapolis, 7 Cir., 150 F.2d 597, 600. But even where the payment by the manufacturer is of the exact amount of the overcharge, as single damages, it may not be deducted as a business expense for tax purposes if the violation was wilful, or the result of negligence or a failure to take practicable precautions. George Schaefer & Sons v. Commissioner of Int. Rev., supra. And where the amount paid by the alleged violator of the Regulation represents single damages, the burden of proof is, nonetheless, on the taxpayer to show that the violation was of such a nature that the allowance of the tax deduction would not frustrate any sharply defined policy of the Act. Jerry Rossman Corporation v. Commissioner of Int. Rev., supra; Commissioner of Internal Revenue v. Heininger, supra.

Juilliard's overcharges, which formed the basis of the trebled damages of $410,219.31 paid by Juilliard to the Treasurer of the United States on January 29, 1943, in settlement of the OPA action against Juilliard instituted November 19, 1942, involved three principal fabrics (A–2391, W–4648, and W–4649) and about twenty "others", comparatively minor, as set forth in the following schedule:

| | Single | Treble |
|-------|--------------:|--------------:|
| A2391 | $110,098.30 | $330,294.90 |
| W4648 | 7,258.20 | 21,774.60 |
| W4649 | 17,450.58 | 52,351.74 |
| Other | 1,932.69 | 5,798.07 |
| | $136,739.77 | $410,219.31 |

*Fabric A–2391* was Juilliard's biggest seller. Close to one-half of Juilliard's total yardage sales were of this fabric. It was also one of Juilliard's high priced fabrics. Any error in figuring its ceiling price per yard, under MPR 163 was bound to run into big money. In determining the ceiling price under MPR 163, Juilliard over-calculated the manufacturing cost of fabric A–2391, by including twice therein labor and overhead items totalling about thirty-three cents a yard. The evidence as to how the duplication of the labor and overhead charge occurred shows that it could have been prevented in the New York office of Juilliard, when two different sets of figures were reported from its Providence mill. Indeed, the duplication was noted by an employee, Elgin, who called it to the attention of his superior, Mr. Schwarz. By his phone talks to Boyer, the Superintendent of the Providence mill, Mr. Schwarz only increased the possibility of the error finding its way into the ceiling price of fabric A–2391 as reported to the OPA on October 19, 1942. The likelihood of that happening should have been clear to Mr. Schwarz. He was on notice. He should have called the matter to the attention of his assistants who were preparing the OPA reports under Amendment 4 and made certain that they correctly figured the A–2391 ceiling price. This error in the ceiling

price of A–2391 was due, at least, to negligence and cannot be excused.

Juilliard also erred in pricing fabric A–2391 on a "similar" fabric basis, instead of as a "new" fabric. The base fabric (W–4512) to which Juilliard claimed fabric A–2391 was similar, was not a proper base fabric for A–2391 when the allowable tolerances were applied to W–4512, in determining whether or not A–2391 was a "similar" fabric. No mention of A–2391 was made in the October 19, 1942 letter accompanying the reports filed with the OPA.

Juilliard's errors in relation to fabric A–2391 were all its own. They were not due to any figures furnished by outsiders as in Jerry Rossman Corporation v. Commissioner of Int. Rev., supra, where the "finishers" of Rossman's "greige" goods furnished incorrect figures as to the amount of shrinkage.

Fabric A–2391 received a ceiling price of $2.825 per yard for settlement purposes, using the "new" fabric formula, and the Stottville markup on the corrected manufacturing costs of the fabric. In 1943, after the OPA action had been settled and Juilliard was making a general recanvass of its base period fabrics, Juilliard discovered in April 1943 among its fabrics manufactured in the applicable base period, a fabric known as A–2313. Juilliard alleges that this fabric was, in fact, a fabric to which A–2391 was "similar", and that the ceiling price of A–2391 should have been computed under the pricing method of "similar" fabrics after September 8, 1942 (when Amendment 4 to MPR 163 went into effect) using fabric A–2313 is a base fabric. The ceiling price computed on a "similar" fabric basis for A–2391 using A–2313 as a base fabric would have been $2.975, fifteen cents per yard higher than the "new" fabric price submitted by Juilliard to OPA in negotiating the settlement figure of $410,219.31 on OPA's money damage claim. Juilliard argues that if it had been known when the settlement was made, that there was this base fabric A–2313 and that it could be used in computing ceiling price for fabric A–2391, the treble damage amount of the settlement would have been reduced by $132,223.62. Juilliard argues that the settlement figure for fabric A–2391 resulted from a "mutual mistake" of the parties, and caused Juilliard to be held for a higher overcharge than it had actually made; and that "to the extent of 15¢ a yard on A–2391, Juilliard was not only not guilty of a wilful or negligent violation of the regulation, it was guilty of no violation at all". A ceiling price for fabric A–2391, using A–2313 as the base fabric, was specifically approved for the year 1943 by the OPA in a letter dated September 28, 1943.

On November 19, 1942 OPA filed its complaint against Juilliard. It contained three claims or causes of action. Injunctive relief was sought under Count I and Count III. Monetary damages of $250,000 trebled to $750,000, were sought under Count II of the complaint. Issue was joined when Juilliard filed its answer in the form of a general denial on December 29, 1942. Preliminary discussions and negotiations got underway between the legal representatives of both sides. A formal settlement was finally arrived at. It was set forth in three stipulations. One was the basis of a Consent Judgment approved by Judge Mandelbaum and filed with the Court on February 1, 1943, which granted injunctive relief. Originally each stipulation was dated January 29, 1943. However, the date on the stipulation attached to the Consent Judgment was changed to read January 30, 1943. This is of no consequence.

The stipulation attached to the Consent Judgment contained the following "Whereas" provision:—

"Whereas this case has been settled by separate stipulation of even date, and pursuant to the provisions of that settlement the parties desire to effectuate signature and entry of final judgment herein,

"Plaintiff and defendant hereby stipulate and consent to signature and entry of final judgment herein in the form attached hereto."

The Consent Judgment, before making provision for the required injunctive relief sought under Count I and Count III of the complaint, contained the following recital:—

"The Administrator of the Office of Price Administration filed his complaint herein November 19, 1942 and the above named defendant appeared and filed its answer to such complaint; the cause of action alleged in Count II of the complaint has been settled by stipulation between the parties dated January 29th, 1943; no testimony having been taken, the defendant consents to the entry of this judgment without any findings of fact on condition that neither such consent nor this judgment shall be evidence, admission or adjudication that it has violated any law of the United States; * * *"

Count II of the complaint was settled by a stipulation (a second stipulation) dated January 29, 1943, which provided:—

"2. In settlement and compromise of Count II of the complaint:

"a) This settlement and compromise is limited exclusively to defendant's fabrics bearing the style numbers enumerated in Exhibit A annexed to the order to show cause herein dated November 19, 1942, and does not cover or include any sale after November 21, 1942, nor does it cover or include any delivery made after November 21, 1942 even though the sale was made prior to November 21, 1942.

"b) Defendant agrees to pay to the Treasurer of the United States the sum of $410,219.31 in full settlement and compromise of any and all claims of the plaintiff arising out of the facts specified in Count II of the complaint. Plaintiff acknowledges receipt from defendant of certified check in that sum payable to the order of the said Treasurer."

This stipulation of settlement of the money damage claim (Count II), although not filed with the Court, was expressly mentioned and referred to in the stipulation attached to the Consent Judgment which was submitted to Judge Mandelbaum and filed with the Court on February 1, 1943. No money judgment was docketed against Juilliard, only the judgment granting injunctive relief. A certified check for the stipulated amount of the money settlement was delivered to the OPA on the same day the stipulation of January 29th, 1943, was executed between the parties. The figure of $410,219.31 was arrived at, in part, from the parties agreement to place a ceiling price of $2.825 a yard on fabric A–2391.

By still another stipulation (the third) dated January 29, 1943, it was agreed between the parties:—(Ex. 43.1)

"1. That under the presently existing Maximum Price Regulation No. 163, as amended to date, issued and effective pursuant to the Emergency Price Control Act of 1942, Exhibit I annexed hereto and made a part hereof correctly specifies defendants maximum prices for the fabrics specified in said Exhibit I.

"2. That this stipulation binds defendant for all purposes, and not merely for this action.

"3. That nothing in this stipulation shall be construed as preventing defendant from applying to plaintiff for adjustment of same pursuant to applicable provisions of said Act and regulations issued thereunder."

Exhibit I attached to that stipulation provided that the maximum ceiling price for fabric style No. A–2391 would be $2.575 per yard.

Mr. Burke, the attorney representing Juilliard in the settlement negotiations with the OPA, testified that the fabric prices set forth in Exhibit I were calculated on a "new" fabric basis using Juilliard's company-wide markup, and not the Stottville markup. They were

to apply in 1943 after the settlement was effected. Juilliard was required to do business under ceiling prices set forth therein until it could convince the OPA that it was entitled to an adjustment pursuant to the Price Control Act and MPR 163 issued thereunder.

Juilliard recanvassed its ceiling prices in 1943 because the prices set forth in the third stipulation "were inordinately low in some instances". Juilliard subsequently (in April 1943) found fabric A-2313 and set it up as a base period fabric for A-2391. This met with the approval of the OPA, as coming within the "similar" formula classification, and Juilliard was thereafter permitted to figure and use a new ceiling price for A-2391.

Mr. Burke further testified that this (the third) stipulation was made part of the settlement because the OPA wanted a record of the ceiling prices (thereafter to be used by Juilliard) to determine whether Juilliard violated the injunction of the court in the future.

■ In Pope v. United States, 323 U. S. 1, at page 12, 65 S.Ct. 16, at page 22, 89 L.Ed. 3, the Supreme Court held:— "It is a judicial function and an exercise of the judicial power to render judgment on consent. A judgment upon consent is a 'judicial act'." In such a case the court, in approving the consent judgment, is in fact adjudicating plaintiff's right of recovery and the extent of it, both of which are essential elements of the judgment.

■ A judgment is conclusive in respect to the parties to it and it cannot be impeached collaterally in an action at law. Mattingly v. Nye, 8 Wall. 370, 75 U.S. 370, 373, 19 L.Ed. 380. The rule in equity is slightly different. It has been held that in the absence of fraud, a court of equity cannot collaterally question the conclusiveness of a judgment at law. Tilton v. Cofield, 93 U.S. 163, 167, 23 L.Ed. 858.

The rule is the same with respect to a consent judgment. In Rector v. Suncrest Lumber Co., 4 Cir., 52 F.2d 946, at page 948, the court stated the principle of law as follows:—

"Rector paid the larger amount under an agreement of settlement; and afterwards consented to a judgment wherein it was recited that all matters in controversy between the parties had been fully compromised and settled, the foreclosure sale to the company was declared null and void, and the suit dismissed. Such a judgment precluded further litigation of the issue, for a judgment entered by consent is as conclusive and final as to any matter determined as one rendered in invitum after contest and trial. [citing cases] And such a judgment cannot be impeached collaterally in another proceeding. [citing cases]."

In Curry v. Curry, 65 App.D.C. 47, 79 F.2d 172, 174, the Court of Appeals for the District of Columbia stated the rule with respect to a consent decree, as follows:—

"For a consent decree, within the purview of the pleadings and the scope of the issues, is valid and binding upon all parties consenting, open neither to direct appeal nor collateral attack. 'A fortiori, neither party can deny its effect as a bar of a subsequent suit on any claim included in the decree.'"

■ A statement by a party that he consents to a decree is equivalent to an admission that the facts exist on which the decree rests, and the only question open is whether that decree could be entered in that cause on any state of facts. Pacific R. Co. v. Ketchum, 101 U.S. 289, 296–297, 25 L.Ed. 932; United States v. Babbitt, 104 U.S. 767, 26 L.Ed. 921; and Curry v. Curry, supra.

■ A consent decree entered pursuant to stipulation of the parties has the same force and effect as any other judgment. It is a final adjudication. Utah Power & Light Co. v. United States, 1930, 42 F.2d 304, 308, 70 Ct.Cl. 391; Nashville, C. & St. L. Railway Co. v. United States, 113 U.S. 261, 266, 5 S.Ct. 460, 28 L.Ed. 971.

Juilliard's present contention of "mutual mistake of fact" with respect to

fabric A–2391, is at odds with the amount of overcharges it consented to pay on fabric A–2391, under the settlement stipulation dated January 29, 1943, and constitutes a collateral attack upon the consent judgment and the money damage settlement in OPA's action against Juilliard. It does not appear that Juilliard made any demand upon the OPA to reopen the settlement and the stipulations and judgment in the OPA action of November 19, 1942 against Juilliard, to have the overcharges recalculated in respect to fabric A–2391, using a price ceiling of $2.975 per yard instead of the $2.825 per yard used on the settlement.

A collateral attack upon a judgment has been defined to mean " 'any proceeding in which the integrity of a judgment is challenged, except those made in the action wherein the judgment is rendered, or by appeal, and except suits brought to obtain decrees declaring judgments to be void ab initio.' " Mitchell v. Village Creek Drainage Dist., 8 Cir., 158 F.2d 475, 478. See also, Higginson v. Schoeneman, 89 U.S.App.D.C. 126, 190 F.2d 32, 34; United Merchants & Mfrs. v. South Carolina El. & G. Co., D.C., 113 F.Supp. 257, 262.

Juilliard in this tax refund action is attempting to avoid the settlement figure, placed upon fabric A–2391, as indicated in the total settlement figure of $410,219.31 of the stipulation referred to in the consent judgment approved and signed by Judge Mandelbaum on February 1, 1943. This constitutes a collateral attack upon one of the component parts of the settlement, referred to in the consent judgment.

Juilliard claims mutual mistake with respect to overcharges computed on fabric A–2391. Juilliard makes no contention that the settlement and consent judgment were procured by extrinsic fraud [1] or that the Court lacked jurisdiction to approve and enter the consent judgment.

A judgment which is erroneous, irregular, or voidable is not subject to collateral attack, but must be corrected by appeal. Baltimore S.S. Co. v. Phillips, 274 U.S. 316, 325, 47 S.Ct. 600, 604, 71 L.Ed. 1069.[2]

The reasons behind the doctrine are well expressed by the Court of Appeals for the District of Columbia in the case of Hodge v. Huff, 78 U.S.App.D.C. 329, 140 F.2d 686, certiorari denied 322 U.S. 733, 64 S.Ct. 946, 88 L.Ed. 1567. The Court, 140 F.2d at page 687, held:—

"The law aims to invest judicial determinations with the utmost permanency consistent with justice. That the formal pronouncements of legal tribunals shall enjoy every possible degree of finality and conclusiveness is a necessary predicate to the proper functioning of courts. To permit their decisions to be evaded for insufficient cause would tend to disrupt the administration of justice and bring courts into disrepute. Sound policy demands that judgments shall not be treated lightly nor easily overthrown. Firmly established principles of law, developed to effectuate this fundamental policy, allow courts to sustain collateral attacks only when the objections to the judgment are such

---

1. Extrinsic fraud is fraud which affects the jurisdiction of the court, which prevents a party from having a trial or from presenting all of his case to the court, or which operates not on the judgment but on the manner in which it is procured, so that there is not a fair submission of the controversy. United States v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93; Cohen v. Randall, 2 Cir., 137 F.2d 441, certiorari denied 320 U.S. 796, 64 S.Ct. 263, 88 L.Ed. 480; Grif-

fith v. Bank of New York, 2 Cir., 147 F. 2d 899, 160 A.L.R. 134; certiorari denied, 325 U.S. 874, 65 S.Ct. 1414, 89 L.Ed. 1992; Maager v. Hoye, D.C., 122 F.Supp. 932.

2. The Supreme Court there held :— "A judgment merely voidable * * * is not open to collateral attack, but can be corrected only by a direct review and not by bringing another action upon the same cause."

as to render it not merely erroneous but void."

A judgment based upon a mistake of fact does not render the judgment void, but at best, only erroneous and voidable. Maager v. Hoye, D.C., 122 F.Supp. 932.[3] Such a judgment is not subject to collateral attack. See also Graham v. United States, 9 Cir., 243 F. 2d 919, 922.

The reservation clause contained in the Consent Judgment affords Juilliard no relief. It provided only that "neither such consent nor this judgment shall be evidence, admission or adjudication that it [Juilliard] has violated any law of the United States". It has no relation to the accuracy of the figures on fabric ceiling prices, which were used in calculating the overcharges that were trebled and included in the settlement figure of $410,219.31.[4]

The consent judgment and settlement of the OPA action is not considered by this court as showing that the Juilliard Company either wilfully caused the overcharges to be made, or that they were the result of negligence or of Juilliard's failure to take "practicable precautions" to avoid violating MPR 163. That would go to the merits of the OPA action. The consent judgment and the settlement figures of the parties are, however, conclusive as to the overcharges on the fabrics in question, which were used as the basis for the settlement figure of treble damages, $410,219.31, paid by Juilliard pursuant to the stipulation on January 29, 1943. The cases of Fruehauf Trailer Co. v. Gilmore, 10 Cir., 167 F.2d 324, 330; and Trapp v. United States, 10 Cir., 177 F.2d 1, 5, are accordingly inapplicable.

Two of the overcharges above-listed related to fabrics W–4648 and W–4649. The record shows that *fabric W–4648* varied by 13.8% instead of the 12% in weight per finished yard allowed under MPR 163 as amended (Amendment 4). Fabric W–4648 was a 16½ ounce per yard fabric. The base period fabric, W–4457, was a 14½ ounce fabric. Fabric W–4648 did not come within the tolerance allowed by the Regulation, and was .26 of an ounce too heavy to be "similar" to the base period fabric, W–4457. The variance between the two fabrics was only 1.8% above the permissible tolerance for weight per finished yard under Amendment 4 of Regulation 163, effective September 8, 1942. But the tolerances specified in the Regulation represented the maximum. Fabric W–4648 priced as a "similar" fabric by Juilliard violated MPR 163. It had to be priced as a "new" fabric and that meant a lower ceiling price. The resulting overcharge was $7,258.20, which was trebled to $21,774.60 in the settlement of the OPA action.

*Fabric W–4649* missed qualifying as a similar fabric on cost of raw material, by a slight margin. The base fabric (W–4497) used in computing the ceiling price of W–4649, was 20.1% higher than the raw material cost of W–4649. The Regulation permitted variance of 20% in the cost of the raw materials in the blend. But there was another factor in which there was a much greater variance, i. e. in the yarn size in the warp and filling yarn. The variances between fabric W–4649 and the base fabric (W–4497), to which Juilliard claimed it was "similar", were 23.1% and 33.3% instead of the permissible 17½% vari-

3. The District Court in Maager v. Hoye, supra, 122 F.Supp. at page 935 held:—
 "A mistake of fact, such as the severity of injuries sustained in a collision, or a change in the facts subsequent to the entering of a judgment, does not render the judgment void, but at most, erroneous and voidable. 30 Am.Jur., Judgments, Section 206; 49 C.J.S. Judgments § 428."

4. Mr. Burke testified to the reason behind the inclusion of the reservation clause in the consent judgment itself. He stated [S.M. 694]:— "the reason that was included was that I thought it might protect the company against a possible damage claim by a customer so that it would not [be] prima facie of anything in analogy to the Section 16, I believe it is, of the Clayton Act. I took the precaution to insert that." The citation Mr. Burke intended was 15 U.S.C. § 16 (§ 5 of the Clayton Act of 1914).

ance in yarn sizes. Accordingly the claimed base fabric (W–4497) was not a proper base fabric for the purpose of determining the ceiling price of fabric W–4649, as a "similar" fabric. In the settlement negotiations, Juilliard was required to price fabric W–4649 on a "new fabric" basis, resulting in the overcharge of $17,450.58, which was trebled to $52,351.74.

The amount of the overcharges in respect to fabrics W–4648 and W–4649 is not contested. Plaintiff's argument is that the variances were so close to the tolerances allowed by the Regulation, as amended September 8, 1942 (Amendment 4), that no overcharges should have been claimed as to these two fabrics, and of course that the overcharges should not have been trebled.

I have concluded that the overcharges on these two fabrics had a proper factual and legal basis and that the OPA was within its rights in insisting that the settlement figure should include those overcharges trebled. The more flexible Chandler Amendment (the Stabilization Extension Act of 1944, 58 Stat. 632) did not go into effect until June 30, 1944.

One mistake made by Juilliard in a number of instances was to figure the tolerance (allowed by Amendment 4) on the subject fabric of 1942, instead of on the base 1941 fabric. That was clear enough if any thought was given to the language used. It was implied at least. If plaintiff had any doubt about it, plaintiff should have inquired. Information that would have prevented that erroneous practice, could have been obtained from the OPA, or from the Woolen Manufacturers Association of which plaintiff was a member and in frequent contact.

 Any feeling on the part of the manufacturer that the OPA Regulation did not permit it to charge a ceiling price with a fair profit to itself "cannot justify a violation of an order" such as MPR 163. The price Regulation contained a provision for relief by an application to the OPA for an "adjustment". "Taking the law into its own hands would

frustrate the policies of the United States in its effort to prevent wartime inflation". National Brass Works v. Commissioner of Int. Rev., 9 Cir., 205 F.2d 104, 106, citing Commissioner of Internal Revenue v. Heininger, supra.

The Pacific Mills case, Commissioner of Internal Revenue v. Pacific Mills, 1 Cir., 207 F.2d 177, 183, cited by Juilliard, embodied claims for MPR violations which at the time of settlement (November 22, 1944) were subject to the Chandler Amendment, in effect June 30, 1944, which made less stringent the penalty provisions of the Emergency Price Control Act. The taxpayer paid the full amount of the overcharges without the addition of any penalty. In that case the tax court held the payment deductible and the First Circuit affirmed. But in the Pacific Mills case the appellate court observed:—"It is nowhere suggested that the taxpayer's interpretation of MPR 163 was unreasonable, and moreover its interpretation was accepted without challenge or even question in December 1942 when its calculation of ceiling prices was first reviewed by representatives of OPA".

That was not the situation in the case at bar. Juilliard's ceiling price reports were never accepted by the OPA. In fact they were rejected and the OPA instituted its action against Juilliard a month after Juilliard filed its October 19, 1942 ceiling price reports with the OPA.

In 1943 Juilliard undertook to make a general survey of its ceiling prices on women's woolen and worsted apparel fabrics, to ascertain if in any other instance its ceiling prices had violated MPR 163, and also to obtain higher ceiling prices than those fixed by a stipulation of January 29, 1943, where that was possible. One result of the survey is stated in Juilliard's letter to the New York office of the OPA, dated October 28, 1943, after a September 17th conference between the parties. It showed overcharges for certain of its fabrics from June 22, 1942 to August 1, 1942, and from August 1, 1942 to date, in the amount of $30,009.24; and undercharges

for certain of its fabrics from April 1, 1943 to date, in the amount of $27,630.-50. After giving some explanation of both the overcharges and undercharges, Juilliard wrote:—"We are of course unable to recover the amount of the undercharges reflected in the appended recapitulation from our customers. We think it fair and reasonable, however, in connection with the determination of our liability to the Administrator for overcharges, that we be permitted to offset the amount of these undercharges". The excess of the net overcharges amounted to $2,378.74, according to Juilliard's letter.

In an OPA memorandum from the New York office to the national office in Washington, D. C., dated November 2, 1943, the New York District Office enforcement attorney, Mr. Pottish, expressed an opinion that Juilliard's offer of settlement should be accepted. A further conference between the parties was held on December 16, 1943 and the settlement figure was raised from $2,-378.74 to $4,184.63.

In a letter dated January 21, 1944, Juilliard wrote the New York OPA office:—"It is our understanding from our counsel, * * * that you will accept in satisfaction of all our liability by reason of overcharges made by us and our customers, * * * the sum of $4,184.-63. We enclose our check drawn to the order of the Treasurer of the United States in this sum."

The offer of settlement was approved by the National Office of the OPA. Juilliard's check in the amount of $4,184.-63 was forwarded to the National Office in Washington, D. C. with a covering memorandum dated February 2, 1944, which recited:—

"The subject [Juilliard] is a manufacturer of woolen and worsted civilian apparel fabrics, and since the date of the entry of a consent decree (February 1, 1943), at which time subject paid treble damages amounting to $410,219.31, subject has determined by a self-audit that it overestimated it's ceiling prices

for new and comparable fabrics to the extent of $4,184.63. The subject voluntarily appeared at this office with a statement of its overcharges."

At the trial Juilliard's proof as to this $4,184.63 payment was limited to the above mentioned documents.

It appears to be Juilliard's contention that the requisite proof of innocence is contained in the documentary proof it offered with respect to the settlement payment of $4,184.63. The documents indicate that Juilliard voluntarily reported these overcharges to the OPA officials and that the OPA approved a settlement of less than single damages by permitting Juilliard to offset against its overcharges the amount of its undercharges.

Juilliard argues that such proof is sufficient of itself to permit the deduction of settlement payment of $4,184.63, "under any test".

One reason the Administrator accepted the $4,184.63 was because of the heavy penalty Juilliard had been required to pay in settling the OPA action. Juilliard was arguing that the OPA should accept the $4,184.63 payment because Juilliard had overpaid, to the extent of $85,000, the amount it should have paid in the settlement of the OPA action on January 29, 1943. The acceptance of the net $4,184.63 by the OPA on January 21, 1944 did not mean that the OPA considered the violations involved in the $4,184.63 payment as innocent, or due to inadvertence, and not due to any lack of proper care on the part of Juilliard.

█ The burden of supplying the requisite proof is on the plaintiff taxpayer. In the first National Brass Works v. Commissioner of Int. Rev. case, 9 Cir., 182 F.2d 526, 527, at page 530, 20 A.L.R.2d 590, the court stated what must be proved by the taxpayer before a deduction would be provided;—

"It seems to us that allowance of the sum paid to the government may be allowed as a business deduc-

tion when the overcharge has been innocently and unintentionally made and not made through an unreasonable lack of care. The whole question resolves itself into proof with the burden on the claimant."

The taxpayer's burden of proof was also discussed in American Brewery v. United States, 4 Cir., 223 F.2d 43, 46, as follows:—

"Whether deduction as a business expense of an overcharge payment made to the O.P.A. would violate the fundamental policy of the Emergency Price Control Act of 1942 is to be determined by deciding whether the overcharges were made unintentionally, after the exercise of proper precaution by the taxpayer to comply with the Act. National Brass Works v. Commissioner, supra; Jerry Rossman Corporation v. Commissioner, 2 Cir., 175 F.2d 711. If the taxpayer proves that he made the overcharges under both these conditions, he is entitled to the deduction, * * *."

In the American Brewery case, the violator made a complete and voluntary disclosure of its pricing structure to the OPA in two letters of August 1943 and "no complaints were received by the O.P.A. or by American from customers." In the Juilliard case oral complaints had been received by the OPA from customers, and Juilliard's pricing methods were designed to prevent the pricing of any of Juilliard's fabrics as "new" fabrics under MPR 163. Only one of the twenty-seven fabrics involved in the January 29, 1943 settlement of the OPA action against Juilliard, was also included in the fabric violations listed in connection with the $4,184.63 settlement payment of January 21, 1944.

The fact that the OPA accepted an amount ($4,184.63) which was less than single damages, is not alone, sufficient to spell out an innocent and unintentional violation. George Schaefer & Sons v. Commissioner of Int. Rev., 2 Cir., 209 F.2d 440, 441–442. The court, through the late Judge Frank, held that "the government's settlement of the suit for one-twelfth of the amount claimed as single damages is not alone, we think, the equivalent of an administrative determination of innocent violation"; and "cannot be deemed the same as a judicial determination" of innocence. "Accordingly, we think the taxpayer, absent proof of such innocence, cannot deduct the settlement payment as a business expense, because to do so would be to frustrate the clear policy of the OPA statute." And Judge Frank stated in a footnote that "that the OPA, during its wartime existence, settled 70% of all the treble-damage suits it brought. See Note 59 Yale L.J. 561, 567."

The fact that Juilliard voluntarily reported these overcharges to the OPA, is not alone sufficient to enable Juilliard to deduct the settlement payment of $4,184.63 as an ordinary and necessary business expense. At best it is some proof, but not conclusive, on the issue of whether the overcharges were made unintentionally, and has no bearing on the additional question of whether they were made after the exercise of practicable precautions by the taxpayer to comply with the act. American Brewery v. United States, supra, at page 47 of 223 F.2d:—

"A further factor tending to show that American's actions were unintentional is that American made a complete and voluntary disclosure of its pricing structures to the O.P.A. * * * While this factor is not conclusive, the Courts generally have felt that such voluntary disclosure is evidence that the original overcharge was not intentional, especially where, as here, no complaints were received by the O.P.A. or by American from customers."

A combination of both factors in the case, that is, voluntarily reporting the overcharges to the OPA official who accepted payment of less than single damages in return for a full discharge, likewise affords Juilliard no relief under the facts found by the court in the case at bar. This is not a situation where

the inference flowing from the presence of these two factors "stands uncontradicted" [Jerry Rossman Corporation v. Commissioner of Int. Rev., supra], but is similar to a situation where "an inference favorable to taxpayer which otherwise might be drawn is here flatly contradicted by the evidence" [George Schaefer & Sons v. Commissioner of Int. Rev., supra, 209 F.2d at page 441.]

Juilliard's interest in having its ceiling prices comply with MPR 163 was aroused only when it was sued by the OPA. It became especially acute after it was required to pay special damages of over $410,000 to the OPA and was limited by stipulation to certain specified prices which it was anxious to have increased. The mistakes involved in the $4,184.63 net payment were the result of similar neglect and failure to take practicable precautions, as were those involved in the $410,219.31 treble damage settlement. So many mistakes point to one conclusion: that they were due to the negligent way in which Juilliard calculated its ceiling prices under MPR 163. And as hereinabove indicated, Juilliard's errors were motivated in most instances by a desire to avoid pricing its fabrics on a "new" fabric basis.

On all the evidence in this case I am satisfied that Juilliard's mistakes were so many and so basicly wrong, that they were due, at least, to Juilliard's negligence and to its failure to take proper precautions to avoid violating the provisions of MPR 163. Those who prepared Juilliard's reports to the OPA under MPR 163 were all Juilliard's agents and Juilliard is bound by their acts. Juilliard received the benefit of the higher prices that Juilliard charged its customers in violation of the Regulation.

I have concluded that no part of the $410,219.31 treble damage payment made by Juilliard on January 29, 1943, or of the payment of $4,184.63 made on January 21, 1944, was deductible as an ordinary and necessary business expense, under Section 23(a) (1) (A) of the 1939 Internal Revenue Code, in figuring Juilliard's net income for excess profits taxes for the year 1943. Juilliard's complaint and all the claims alleged therein are dismissed on the merits, with costs to the defendant. Let judgment be entered accordingly.